STATE of Wisconsin, Plaintiff-Respondent,

v.

Garland HAMPTON, Defendant-Appellant.†

Court of Appeals

*No. 96–0156–CR. Submitted on briefs October 1, 1996.—Decided December 10, 1996.*

(Also reported in 558 N.W.2d 884.)

†Petition to review denied.

For the defendant-appellant the cause was submitted on the briefs of *Robin Shellow* and *Angela Conrad* of *Law Offices of Robin Shellow*, of Milwaukee.

For the plaintiff-respondent the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *Sally L. Wellman*, assistant attorney general.

Before Wedemeyer, P.J., Schudson and Curley, JJ.

CURLEY, J. Garland Hampton appeals from a judgment of conviction for first-degree intentional homicide while using a dangerous weapon, as party to a crime. He raises three issues for review: (1) whether the trial court erroneously exercised its discretion when it excluded his testimony about his "psycho-social" history that he argues was relevant to his state of mind at the time of the homicide and his belief he acted in self-defense; (2) whether the trial court erred when it denied his double jeopardy motion to dismiss arising out of a mistrial granted in his first trial when a prosecutor questioned him on previously excluded evidence; and (3) whether the trial court erroneously exercised its discretion when it rejected his requested jury instruction on the standard of a reasonable person as it applied to a child in a self-defense situation.

We conclude that the trial court correctly excluded Hampton's proposed "psycho-social" history evidence because, under Wisconsin case law, the evidence had no relevance to Hampton's theories of self-defense. Additionally, the trial court properly denied Hampton's motion to dismiss based on double jeopardy grounds because the trial court rightly determined that the State did not intend to provoke a mistrial with its questioning. Finally, the trial court did not erroneously

370

exercise its discretion when it denied Hampton's requested jury instruction because the instruction given to the jury properly stated the relevant law. In sum, we reject all of Hampton's arguments and affirm.

## I. BACKGROUND.

Hampton, a fifteen-year-old juvenile, was arrested and charged in the shooting death of fifteen-year-old Donnell Storks. The following facts relating to the shooting were presented in Hampton's defense at trial.[1] On June 10, 1994, Hampton, Storks, and several other people were outside a house on the north side of Milwaukee. While Storks and the others were gambling, Hampton was sitting on the steps of the house counting his money. Storks and Kenyatte Helm suddenly came up to Hampton and said, "Here they come." Hampton thought the reference was to members of the Gangster Disciples, a rival street gang, who had been firing guns in the neighborhood earlier in the day. He ran to the back of the house and watched as a car drove down the street. He saw Storks and Helm brandishing their handguns as they stepped to the side of the porch. Hampton drew his handgun as well. Storks and Helm said, "That ain't them," meaning the car's occupants were not Gangster Disciples.

---

[1] Because of the nature of the issues raised in this case, the background facts given above are those most sympathetic to Hampton's theories of self-defense. For purpose of completeness we note that under the State's version of the case, Hampton had Kenyatte Helm lure Storks to the backyard where Hampton was waiting in ambush to confront Storks about his missing money. Hampton then shot Storks from point-blank range in retaliation for the disappearance of his money. There was compelling evidence introduced at trial which supported the State's version of the homicide.

Hampton then went back to the porch and noticed that his money was missing. He began searching for it but could not find it. He then confronted Storks and Helm about the money; Storks became very angry, stating, "I ain't got your damn money."

While Hampton was still at the house, Helm asked Storks to go with him to the First Street area because some Gangster Disciples had been spotted there earlier. Storks got up off the steps and leaned near the bushes by the house. He said something about "getting strapped," meaning getting a handgun. Storks, Helm, and Hampton then began walking to a nearby tavern. While on the way, Hampton and Storks continued to argue about the missing money. Hampton noticed that Storks had a handgun in his hand. Storks persisted in arguing with Hampton and was moving his hand while holding the gun. Hampton pulled his gun out and shot Storks twice in the head from point-blank range, killing him. Police arrested Hampton for the homicide and he was waived into adult court.

Hampton's only theories of defense throughout all the proceedings were "perfect" and "imperfect" self-defense. Essentially, Hampton's argument was that "he was afraid of [Storks] and that he thought he was going to die." In support of this theory he sought to introduce state-of-mind evidence and "psycho-social" history he alleged was relevant to his state of mind at the time of the shooting. Thus, in one pre-trial motion Hampton sought the admission of the following alleged events:

> 1. Garland Hampton, at the age of 6, witnessed his mother shoot a woman in the chest on the way to a bar.
> 2. Garland witnessed his mother, Willie Jean Hampton, shoot and kill Charles Cheirs, the father

of three of her children, in front of him and his brothers and sisters.

3. Garland witnessed his mother attempt to commit suicide on at least two occasions.

4. Garland witnessed his aunt, Melinda Collins, stab her son and his cousin Antonio with a meat fork.

5. Garland was poisoned by his aunt, Melinda, with rat poisoning [sic].

6. Garland was attacked by his aunt, Melinda, with razor blades.

7. Garland was told by his grandmother Fay Lee McCoy that she had shot and killed two people and threatened to kill him on numerous occasions for such unreasonable infractions as buying lettuce instead of cabbage.

8. Garland witnessed his sister suffer second degree burns at the hands of his grandmother.

9. Garland was threatened recently when his grandmother held a gun to his head for failing to clean his room.

10. Garland was taken to the emergency room on several occasions for numerous injuries which were suspected to be the result of child abuse. Garland would testify that he was regularly beaten by his mother and grandmother.

11. Garland was strung up by his neck by his godfather Charles Cheirs.

The trial court did not allow Hampton to introduce any of this "psycho-social" history because it concluded that Hampton had not shown a sufficient connection between any of these past events and Storks's homicide; a connection the trial court concluded was necessary under Wisconsin's law of self-defense. Thus, the trial court concluded that none of the evidence was relevant to Hampton's theory of self-defense.

In another motion Hampton sought the admission of testimony on the following other alleged past instances of violence of which he was a victim:

I. About a month before the shooting of Donnell Storks, Garland Hampton's grandmother, Fay Lee McCoy, pointed a shot gun at him and said that she was going to "blow his brains out." Garland will testify that he thought she was going to kill him.

II. Garland will testify that he was shot in front of his grandmother's house, 106 W. Keefe. Garland ran when the shots started and one of the shooters followed him into the alley near his house. He could hear the bullets hitting the garbage cans that were next to him. He will testify that he was scared and that he thought he was going to be killed.

III. Garland was on Keefe when some guys drove up beside him. Garland will testify that he heard gunshots, and thought that he had been shot because he was so close to the car. He was afraid and thought he was going to die.

IV. When Garland was 9 years old, he saw his mother kill his stepfather, Charles Cheirs in the kitchen of their apartment. He will testify that he hid behind the washing machine so that his mother would not realize that he had witnessed the shooting and kill him too. He will testify that he was scared and thought he was going to be killed.

The trial court ruled that items II and III, which took place in the spring and summer of 1994 and were gang related, had "some minimal connection" to the theory of defense and therefore would be admissible. Consistent with its earlier ruling on the "psycho-social" history evidence, the trial court ruled that items I and IV were social history and therefore irrelevant.

The case proceeded to a jury trial. During the State's cross-examination of Hampton the following exchange took place:

Q. You were so cold about this, Mr. Hampton, that after you shot and killed Mr. Storks, you went and told his sister that you had found him, dead, didn't you?
A. Yes.
Q. You didn't tell her that you killed him, did you?
A. No.
Q. You didn't tell Scoobie that you killed him, did you?
A. No.
Q. You told everyone that you just found brother Donnell dead, didn't you?
A. Yes.
Q. You were so scared that minutes after you shot and killed him, you made up a lie, you comforted his sister, didn't you?
A. Yes.
Q. You hugged her and told her you didn't know who could have done something like this to her brother, didn't you?
A. Yes.
Q. Shooting and killing somebody that you know is just one of those things that happens for you, isn't it?
A. Yes.

Hampton moved for a mistrial, arguing that the State's last question violated the trial court's earlier ruling on the admissibility of Hampton's past history with violence. After a period of deliberation, the trial court granted the motion for a mistrial, concluding that the State's question would force Hampton to use the previously excluded "psycho-social" history to refute the implication in the State's question. Because the

trial court concluded that Wisconsin law did not allow the admission of such evidence, the only alternative was to grant the mistrial. A new trial was set and the trial court stated that its earlier rulings on the admission of evidence would stand in the second trial.

Hampton moved the court to dismiss the complaint premised on an alleged violation of his right against double jeopardy. He argued that the State's improper questioning in the first trial was prosecutorial misconduct intended to provoke him into moving for a mistrial. The trial court found that there was "no support in the record for the proposition that the prosecutor acted improperly, was motivated by bad faith or intentionally mistried [the] case." Accordingly, the trial court denied the motion to dismiss. The second trial proceeded without difficulty; Hampton's "psycho-social" history was not admitted.

At the close of evidence, Hampton submitted an alternative jury instruction on the reasonableness of his beliefs for purposes of his theory of self-defense. The instruction provided:

> The reasonableness of Garland Hampton's belief that he was in imminent danger of death or great bodily harm is determined by the standard of a person of ordinary intelligence and prudence under all the circumstances existing at the time of the offense, including the right of such person to act upon appearances. Generally in the case of children, beliefs, instincts and impulses are judged in relation to those of a reasonable person of like age, intelligence and experience.

The trial court did not allow the alternative instruction in its entirety, but allowed a modified version to be presented to the jury. The court modified the second

sentence to read: "Generally, *a person's* beliefs, instincts and impulses are judged in relation to those of a reasonable person of like age, intelligence and experience." (Emphasis added.) The trial court concluded that the use of the term "child" would confuse the jury because jurisdictionally Hampton was being tried as an adult not a child.

The jury found Hampton guilty of first-degree intentional homicide while using a dangerous weapon. The trial court sentenced him to life in prison. This appeal follows.

## II. ANALYSIS.

### 1. *Exclusion of Evidence.*

Hampton first argues that the trial court erroneously exercised its discretion when it excluded his testimony on specific instances in his past when he had experienced or witnessed violence. He argues that this "psycho-social history" evidence in question was relevant "state of mind" testimony that went to his reasonable belief that he was acting in self-defense when he shot and killed Storks. The trial court ruled that Hampton's proffered evidence was not admissible because there was no sufficient connection shown between any of the past history evidence and the events occurring on the night of the shooting. In other words, the evidence was not relevant to Hampton's self-defense arguments, nor was it relevant to any other issue at trial. We agree with the trial court.

A trial court has wide discretion in determining whether to admit or exclude evidence. *State v. Ross,* 203 Wis. 2d 66, 80, 552 N.W.2d 428, 433 (Ct. App. 1996). Further, when we review a trial court's

discretionary decision, we only consider " 'whether the trial court properly exercised its discretion, putting to one side whether we would have made the same ruling.' " *State v. Smith,* 203 Wis. 2d 288, 295, 553 N.W.2d 824, 827 (Ct. App. 1996) (citation omitted). Thus, "[i]f the trial court applies the relevant law to the applicable facts and reaches a reasoned conclusion, the trial court has properly exercised its discretion." *Ross,* 203 Wis. 2d at 80, 552 N.W.2d at 433.

Hampton first argues that this court's recent decision in *State v. Morgan,* 195 Wis. 2d 388, 536 N.W.2d 425 (Ct. App. 1995), which was decided shortly after Hampton's trial, mandates the admission of his proposed "psycho-social" history evidence. We disagree.[2]

The primary issue in *Morgan* was whether the defendant should be allowed to introduce expert and lay testimony on post-traumatic stress disorder and the defendant's allegedly related "psycho-social" history in the guilt phase of her bifurcated trial. *Id.* at 398, 536 N.W.2d at 428. We concluded that the proposed post-traumatic stress evidence was irrelevant "to any issue or to any recognized privilege or defense to criminal conduct" in the guilt phase of her bifurcated trial. *Id.* at 416, 536 N.W.2d at 435. Further, we concluded that the litany of "psycho-social" evidence detailing the defendant's alleged past experiences with violence was not relevant because the defendant had not demonstrated the " 'legal significance' of the psycho-social history evidence to the guilt phase of her trial." *Id.* at 431, 536 N.W.2d at 411 (footnote omitted).

---

[2] We note that the trial and appellate defense counsel in the present case was the trial and appellate counsel in *State v. Morgan,* 195 Wis. 2d 388, 536 N.W.2d 425 (Ct. App. 1995).

Hampton argues that in the present case he has shown the "legal significance" of his "psycho-social" history, namely that it was relevant to the reasonableness of his actions under his self-defense theories. He contends that this testimony "would have shown that [his] fear was reasonable from his position at the time and in light of his own experiences."

Contrary to Hampton's assertions, *Morgan* is not very relevant to the issue he raises in this case. First, we note the danger of transposing to a single-phase trial, a rule of law arising out of a bifurcated trial. Both the majority and the concurrence/dissent in *Morgan* discussed the difficulty of such a "juxtaposition." *See id.* at 413, 536 N.W.2d at 434; *see also id.* at 455, 536 N.W.2d at 451 (Schudson, J. concurring in part, dissenting in part). The issues and the complicated standards of admission are very different in the two trial procedures. *Id.* at 407, 536 N.W.2d at 431.

Second, with respect to the specific issue raised by Hampton in this case, *Morgan* only states the obvious: In order for any "psycho-social" history evidence to be admissible it must have "legal significance" to some issue at trial. *Id.* at 431, 536 N.W.2d at 441; *see also* RULE 904.02, STATS.[3] Here, Hampton argues that the evidence had legal significance to his theories of self-defense; but *Morgan* provides no guidance on the standards of admissibility for evidence tied to a self-

---

[3] RULE 904.02, STATS., provides:

**Relevant evidence generally admissible; irrelevant evidence inadmissible.** All relevant evidence is admissible, except as otherwise provided by the constitutions of the United States and the state of Wisconsin, by statute, by these rules, or by other rules adopted by the supreme court. Evidence which is not relevant is not admissible.

defense theory.[4] Accordingly, we must analyze Wisconsin's law of self-defense to determine the relevance of Hampton's proposed evidence.

In order for the privilege of self-defense to apply, a defendant in a criminal trial must reasonably believe he or she was preventing or terminating an unlawful interference with his or her person. *See* § 939.48(1), STATS.[5] "This initial requirement of a reasonable belief is a threshold requirement." *State v. Camacho,* 176 Wis. 2d 860, 872, 501 N.W.2d 380, 384 (1993). "The standard is what a person of ordinary intelligence and prudence would have believed in the position of the defendant under the circumstances existing at the time of the alleged offense." WIS J I—CRIMINAL 1014 (1994). Further, "[t]he reasonableness of that belief must be determined from the standpoint of the defendant at the time of his [or her] acts." *Id.* Thus, there is both a subjective component to self-defense—that is, the

---

[4] We also note that Hampton, like the defendant in *Morgan*, did not argue before this court that the "psycho-social" evidence was admissible "other act" evidence under § 904.04(2), STATS. *See* CHRISTINE M. WISEMAN ET AL., CRIMINAL PRACTICE AND PROCEDURE § 17.22 at 433 n.38 (West Wisconsin Practice Series, Vol. 9, 1996) (discussing "psycho-social history" evidence in *Morgan*).

[5] Section 939.48(1), STATS., provides:

A person is privileged to threaten or intentionally use force against another for the purpose of preventing or terminating what the person reasonably believes to be an unlawful interference with his or her person by such other person. The actor may intentionally use only such force or threat thereof as the actor reasonably believes is necessary to prevent or terminate the interference. The actor may not intentionally use force which is intended or likely to cause death or great bodily harm unless the actor reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself.

defendant must actually believe he or she was preventing or terminating an unlawful interference; and an objective threshold component—that is, the belief must be reasonable.

Hampton essentially is arguing that in order to determine the reasonableness of a defendant's belief "from the standpoint of the defendant" a jury must know the individual defendant's personal background and "psycho-social" history. As the State notes in its brief, under Hampton's view of the law, "a reasonable person would mean a reasonable person who is, in fact, identical to the actual defendant in terms of personal background and life experience." We agree with the State that this "would eviscerate the objective, reasonable person requirement." The reasonableness of the belief is judged from the position of "a person of ordinary intelligence and prudence" in the same situation as the defendant, not of a person identical to the defendant placed in the same situation as the defendant. This is common sense because otherwise the privilege of self-defense would vary depending on the background or personal history of the person attempting to exercise the privilege.[6] A person exposed

---

[6] We note that the dissent in *State v. Camacho*, 176 Wis. 2d 860, 877, 501 N.W.2d 380, 390 (1993), advocated just such a view of criminal culpability and self-defense:

> A person who has previously been the victim of a violent crime who later panics and under an unreasonable but actual belief takes the life of another because he or she actually believes that his or her person is in danger is not as culpable as one who kills in cold-blood for no reason other than to murder another. The two people should not be treated the same.

*Id.* at 877, 501 N.W.2d at 390 (Bablitch, J., dissenting). The majority in *Camacho* rejected this argument in creating the objective threshold standard of reasonableness.

to a lifetime of violence would have greater latitude to exercise the privilege of self-defense than a person raised in a life free from strife. Further, this is contrary to mandates of public policy as stated by our supreme court:

> The privilege to act in self-defense does not exist in a vacuum. Sound public policy dictates that a person may exercise the privilege to act in self-defense only when they possess a reasonable belief that the action will prevent or terminate an unlawful interference with their person. If the law were otherwise, every defendant who claimed an actual belief in the need to use force would escape conviction for first-degree murder.

*Id.* at 876, 501 N.W.2d at 386.

As such, none of Hampton's proffered "psycho-social" evidence that was rejected by the trial court is relevant to this objective standard of reasonableness. It in no way has any tendency to make the existence of any fact that is of consequence to this objective threshold standard more or less probable. *See* RULE 904.01, STATS. (defining relevant evidence).[7]

We acknowledge that Wisconsin law has recognized the relevance of some personal history evidence in the context of homicides in battered spouse situations. *See State v. Richardson,* 189 Wis. 2d 418, 426, 525 N.W.2d 378, 382 (Ct. App. 1994); *State v. Felton,* 110 Wis. 2d 485, 508-09, 329 N.W.2d 161, 171-

---

[7] RULE 904.01, STATS., provides:

**Definition of "relevant evidence".** "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

72 (1983). The trial court in the present case, however, rightfully recognized the difference in Hampton's "psycho-social" evidence from that admitted in the battered spouse cases where the evidence sought to be admitted is generally that of past instances of violence between the batterer-victim and the defendant. In such cases there is a direct connection between the pattern-of-abuse evidence and the homicide; that is, the actors in that evidence are the homicide victim and the defendant. Here, by contrast, none of the evidence excluded by the trial court involved past instances of violence exhibited by Storks towards Hampton. The proposed evidence all involved remote instances of alleged violence committed by third persons not involved in the events surrounding Storks's homicide. As such, most of the alleged events " 'are earlier episodes in the life of the defendant, remote in time, that cannot be given continuing significance on the issue of the defendant's' " actions. *Morgan*, 195 Wis. 2d at 431, 536 N.W.2d at 441 (citation omitted). Further, Hampton has not presented this court with any Wisconsin cases in which such remote and unrelated personal history evidence has been admitted in self-defense situations. In short, we conclude the trial court properly exercised its discretion when it excluded Hampton's proposed "psycho-social" history evidence. The trial court correctly concluded that none of the excluded evidence was relevant to Wisconsin's law of self-defense.

█

We also conclude that Hampton's right to due process and right to present a defense were not violated by the exclusion of the evidence. "Whether a defendant's right to present a defense was violated is a question of 'constitutional fact' that we review *de novo*."

*Id.* at 432, 536 N.W.2d at 441. "While the rights granted by the Confrontation and Compulsory Process Clauses are fundamental and essential to achieving the constitutional objective of a fair trial, there is no constitutional right to present irrelevant evidence." *Id.* (citation omitted). Here, the trial court properly determined that Hampton's proposed evidence was irrelevant, hence there was no violation of any constitutional right to present a defense by the evidence's exclusion.

### 2. *Double Jeopardy.*

Next, Hampton argues that the trial court erred when it denied his motion to dismiss on grounds of double jeopardy. He argues that the prosecutor's improper questioning at his first trial was prosecutorial misconduct intended to provoke him into moving for a mistrial. We disagree.

The Double Jeopardy Clause bars a retrial after a defendant successfully moves for a mistrial only if the prosecutor acted with the intent to subvert the defendant's double jeopardy protection. *State v. Quinn,* 169 Wis. 2d 620, 625, 486 N.W.2d 542, 544 (Ct. App. 1992). Whether a prosecutor intended to provoke a mistrial in order to gain another chance to convict or harass the accused is a question of fact; thus, a trial court's determination that the prosecutor did not act with intent to provoke a mistrial will not be overturned unless it is clearly erroneous. *Id.* at 626, 486 N.W.2d at 544.

The trial court found that there was "no support in the record for the proposition that the prosecutor acted improperly, was motivated by bad faith or

intentionally mistried [the] case." Hampton points to nothing in the record from which we could conclude that the trial court's finding was clearly erroneous. He offers nothing more than conclusory allegations that the prosecutor intentionally asked the question in order to abort the first trial. Indeed, as the trial court noted, the prosecutor objected to Hampton's motion for mistrial. The record in this case completely refutes Hampton's allegation; there was no error here.

### 3. Jury Instruction.

Finally, Hampton argues that the trial court erroneously exercised its discretion when it refused to give the defendant's requested instruction on the standard of a reasonable person as it applied to a child and the privilege of self-defense. We disagree.

■

"A trial court has wide discretion in presenting instructions to the jury." *Morgan,* 195 Wis. 2d at 448, 536 N.W.2d at 448. As such, we will not reverse such a determination absent an erroneous exercise of discretion. *Id.* Further:

> If [the trial court's] instructions adequately cover the law applied to the facts, a reviewing court will not find error in refusing special instructions even though the refused instructions would not be erroneous. A defendant is entitled to an instruction on a valid theory of defense, but not to an instruction that merely highlights evidentiary factors. Such instructions are improper, and trial courts are correct if they reject them.

*State v. Amos,* 153 Wis. 2d 257, 278, 450 N.W.2d 503, 511 (Ct. App. 1989) (citations omitted).

The trial court submitted the following instruction to the jury:

> The reasonableness of Garland Hampton's belief that he was in imminent danger of death or great bodily harm is determined by the standard of a person of ordinary intelligence and prudence under all the circumstances existing at the time of the offense, including the right of such person to act upon appearances. Generally, *a person's* beliefs, instincts and impulses are judged in relation to those of a reasonable person of like age, intelligence and experience.

(Emphasis added.) Hampton had requested a similar instruction to that above, however, the last sentence in his version read: "Generally, *in the cases of children*, beliefs, instincts and impulses are judged in relation to those of a reasonable person of like age, intelligence and experience." (Emphasis added.) The trial court altered the requested instruction to remove the phrase relating to children because the court concluded that it might confuse the jury. The court reasoned that jurisdictionally Hampton was being tried as an adult not a child.

The trial court did not erroneously exercise its discretion in denying Hampton's requested jury instruction. The jury instruction, as read, properly stated the law concerning self-defense. Further, there was no need to alter the instruction in light of the fact that Hampton was fifteen years old at the time of the homicide. Hampton was standing trial in an "adult" court and, whether the jury viewed him as a fifteen-year-old or as an adult, the instruction accurately referred to him as "a person[ ]."

### III. SUMMARY.

In short, we conclude that the trial court properly excluded Hampton's "psycho-social" evidence because under Wisconsin law it was not relevant to his theories of self-defense. We also conclude that the trial court properly rejected Hampton's double jeopardy claim because the trial court's finding that the prosecutor did not intend to provoke a mistrial in Hampton's first trial was not clearly erroneous. Finally, the trial court did not erroneously exercise its discretion in rejecting Hampton's proposed jury instruction because the instruction actually given to the jury adequately stated the applicable law.

*By the Court.*—Judgment affirmed.