STATE of Wisconsin, Plaintiff-Respondent,

v.

Shirley J. PETERS, Defendant-Appellant.

Court of Appeals

*No. 01–0555–CR. Submitted on briefs August 8, 2002.—Decided September 18, 2002.*

2002 WI App 243

(Also reported in 653 N.W.2d 300.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Steven P. Weiss*, assistant state public defender, of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Christian R. Larsen*, assistant attorney general.

Before Nettesheim, P.J., Brown and Snyder, JJ.

¶ 1. BROWN, J.   Shirley J. Peters appeals both from a judgment of conviction for first-degree intentional homicide for shooting and killing her husband, Marvin Peters, and an order denying her postconviction motion. Peters argues on appeal that the trial court erred when it ruled that she failed to satisfy the objective threshold showing for both perfect and imperfect self-defense and refused to issue the self-defense jury instructions she requested.

¶ 2.   In light of the supreme court's recent decision, *State v. Head*, 2002 WI 99, No. 99–3071–CR, we reverse and remand to the trial court for two reasons. First, based on the supreme court's holding in *Head* that a defendant need not satisfy an objective threshold showing for imperfect self-defense, we determine that the real controversy of imperfect self-defense was not fully tried. We, therefore, exercise our statutorily recognized power of discretionary reversal under Wis. Stat. § 752.35 (1999–2000)[1] to reverse the judgment and order. Second, applying the "some" evidence standard clarified in *Head*, we conclude that the trial court erred by refusing to instruct the jury on perfect self-defense and that this error was not harmless. We therefore reverse the judgment and order and remand the case to the trial court for a new trial.

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

¶ 3. Peters was charged with first-degree intentional homicide for shooting her husband, Marvin. Peters did not dispute that on the morning of Monday, October 5, 1998, she shot her husband six times and killed him. Rather, she claimed she acted in self-defense. The evidence proffered at trial pertinent to Peter's claim of self-defense can be summarized as follows.

¶ 4. Peters testified about the emotional and verbal abuse she suffered in the days and weeks before the shooting. According to Peters, Marvin would scream at her all of the time and shove her around, but he would not actually hit her. Marvin would not let Peters go anywhere on her own. Peters' son, Ed Zimmerman, testified that he had seen Marvin grab Peters and shove her around and yell at her.

¶ 5. Peters testified that the couple had guns in the house and that Marvin kept a gun within reach of the chair in which he usually sat in the dining room. Peters' neighbor, Paul Nord, and Zimmerman both testified that Marvin generally kept a loaded .22 rifle near the chair he normally sat in. Nord further testified that it would not be difficult for Marvin to reach over from his chair and grab the rifle. Peters also testified that in the ten days prior to the shooting, Marvin had been playing with his rifle and this frightened her.

¶ 6. Peters testified that on the day before the shooting she thought he was going to kill her. She stated that Marvin had pointed a .22 rifle at her while trying to install a scope on the rifle. Afterwards, she stated she was "to the point of where I was frightened that he was gonna shoot me." According to Peters, that same day Marvin also threatened her after the two discussed divorce. She stated that he brought bullets out of the bedroom, put them in his pockets and told her

"there wouldn't be a divorce there. Somebody might die. But there wouldn't be a divorce." Zimmerman also testified that Peters had told him that Marvin had threatened her with the rifle.

¶ 7. Peters stated that on the morning of October 5, Marvin was sitting in his usual chair in the dining room and the two had been arguing. After Marvin stated that he was going to call his attorney, she testified that she had told Marvin that she wanted to leave and that she was going to call her son so she could have him come and pick her up. She testified that when she attempted to call her son, Marvin became angry, disconnected the phone and stated, "you're not going anyplace and you're not calling anybody."

¶ 8. Peters then left the dining room, went to her bedroom and retrieved a gun she purposefully had hidden in the headboard of her bed the night before. She testified that she then walked back to the dining room area and intended to frighten Marvin with the gun. According to Peters, when she walked back into the room

> [Marvin] pushed the chair straight back. He stood up and he was if—because he was a big man, he pretty well blocked the door, and when he seen I had a pistol, he said, I believe he said, I'm sorry Shirley, don't, I'm sorry, and I seen his right hand where the gun was, I seen him start to drop his right hand that way to where he usually kept the rifle [over in the corner].[2]

---

[2] In Shirley Peters' initial statements to the police she did not relate that she had seen Marvin move his hand to where he usually kept the rifle at the time she shot him. Six months after the shooting, Peters mentioned in a statement to a corrections officer that she thought Marvin was dropping his right hand towards his rifle.

She stated she thought that at the time he was going to get his rifle and shoot her. Peters testified that she then fired the gun.

¶ 9.   After shooting Marvin, Peters reconnected the phone lines and called 911. She admitted shooting her husband to the 911 dispatcher and stated, "he's been so mean to me, I can't stand it anymore . . . . I had a pistol and I shot him." She also called Marvin's son, Stephen, who arrived at the home shortly thereafter and spoke with the 911 dispatcher. Stephen told the dispatcher that Marvin kept rifles in the home, including a .22 rifle, which he indicated was located near Marvin's body. The police dispatcher, the voice on the 911 tape, testified that Stephen did state to him that there was a .22 rifle in the room. The crime scene investigator, however, did not find a rifle lying in the area where Marvin was shot and killed. The crime scene investigator testified that they had only found a gun in the corner of the room behind a bookcase and covered in cobwebs.

¶ 10.   Peters requested jury instructions on both perfect and imperfect self-defense. At the conclusion of the trial, the trial court determined that it had to evaluate whether or not Peters had a reasonable basis to believe that she faced unlawful interference. Based upon this standard, the court found that Peters had failed to establish a sufficient factual basis to warrant the submission of jury instructions on self-defense and denied her request. The jury convicted Peters of the first-degree intentional homicide charge.

¶ 11.   The court sentenced Peters to life in prison without parole. Peters filed a postconviction motion arguing, in part, that the court's refusal to give jury instructions on self-defense constituted error requiring a new trial. The court denied the motion.

155

¶ 12.   This case requires the court to review the trial court's decision not to submit a jury instruction on self-defense. Whether there are sufficient facts to allow the issuing of an instruction is a question of law which we review de novo. *State v. Mayhall*, 195 Wis. 2d 53, 57, 535 N.W.2d 473 (Ct. App. 1995). A court errs when it refuses to give an instruction on an issue raised by the evidence. *Id.* If we determine that a trial court has committed an error in refusing to give a jury instruction, we must assess whether the substantial rights of the defendant have been affected. Wis. Stat. § 805.18(2).

¶ 13.   Since the trial court's ruling, we have had the benefit of the Wisconsin Supreme Court's instruction on perfect self-defense and unnecessary defensive force, the equivalent of imperfect self-defense. The supreme court's detailed analysis of the law of self-defense in *Head* controls this case. The facts in this case closely resemble the facts in *Head* and we begin our analysis with a brief discussion of that recent decision.

¶ 14.   Debra Head was convicted by a jury of first-degree intentional homicide for shooting and killing her husband. *Head*, 2002 WI 99 at ¶ 1. Head asserted claims of perfect and imperfect self-defense. *Id.* at ¶ 2. In her statements to the police, Head related that her husband had been verbally, but not physically, abusive. *Id.* at ¶ 23. In support of her defense, Head testified that her husband had threatened to kill her if she ever filed for divorce, the couple kept several guns in the house, and at the time she shot him, she and her husband had been arguing and she thought that he had been attempting to move towards her and grab the gun. *Id.* at ¶¶ 14–18, 22, 28.

¶ 15.   The trial court ruled that Head had failed to satisfy the objective threshold for imperfect and perfect self-defense and refused to issue a jury instruction on self-defense. *Id.* at ¶ 36. Consequently, the court instructed the jury only on first-degree intentional homicide and Head was convicted of the charge. *Id.* at ¶¶ 36–37. We affirmed, citing *State v. Camacho*, 176 Wis. 2d 860, 501 N.W.2d 380 (1993), for the proposition that imperfect and perfect self-defense both have objective and subjective components. *Id.* at ¶ 38. In affirming the conviction, we noted that "[Head] did not testify that her husband made a direct verbal threat against her, or that he engaged in any overtly violent acts or gestures, in the moments leading up to the shooting." *Head*, 2002 WI 99 at ¶ 38 n.7.

¶ 16.   After analyzing the revised statutes governing imperfect and perfect self-defense, the supreme court announced a new standard for unnecessary defensive force (imperfect self-defense). The court modified *Camacho* to the extent that it contained an objective threshold element requiring defendants to have a reasonable belief that they were preventing or terminating an unlawful interference with their person in order to raise the issue of unnecessary defensive force. *Head*, 2002 WI 99 at ¶ 104. The court held that defendants seeking a jury instruction on unnecessary defensive force to a charge of first-degree intentional homicide must present "some" evidence that they *actually* believed that they were in imminent danger of death or great bodily harm and *actually* believed that the force they used was necessary to defend themselves. *Id.* at ¶ 5. The court determined that based on the evidence presented at trial, Head was entitled to a jury instruction on imperfect self-defense. *Id.* at ¶ 7.

¶ 17.   The court further clarified the standards for perfect self-defense. The court held that defendants seeking a jury instruction on perfect self-defense to a charge of first-degree intentional homicide must satisfy an objective threshold showing that they *reasonably* believed that they were preventing or terminating an unlawful interference with their person and *reasonably* believed that the force they used was necessary to prevent imminent death or great bodily harm. *Id.* at ¶ 4. According to the court, the threshold for perfect self-defense evidence logically is higher than the threshold for imperfect self-defense evidence because of the objective reasonableness component required for perfect self-defense. *Id.* at ¶ 116. The court instructed the trial court on remand to apply the correct standards for the perfect self-defense instruction. *Id.* at ¶¶ 4–5.

■

¶ 18.   We now apply the law of self-defense as set forth in *Head* to the facts of this case. We first turn to the issue of the trial court's refusal to give a jury instruction on imperfect self-defense. We conclude that Peters should be granted a new trial in the interests of justice because the real controversy of imperfect self-defense was not fully and fairly tried. Wisconsin Stat. § 752.35 recognizes our authority to reverse a judgment or order appealed from and remand for a new trial, "if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried." We understand that the power of discretionary reversal is formidable. *State v. Watkins*, 2002 WI 101, ¶ 79, No. 00–0064–CR. We are convinced it should be applied here.

158

¶ 19.   The trial court, operating without the benefit of the supreme court's guidance in *Head*, applied *Camacho*'s objective threshold, and required Peters to establish a reasonable belief that she was preventing or terminating an unlawful interference with her person. Under the law of imperfect self-defense set out in *Head*, in order for Peters to be entitled to a jury instruction on imperfect self-defense, she would need to present only "some" evidence that she *actually* believed that she was in imminent danger of death or great bodily harm and *actually* believed that the force she used was necessary to defend herself. *See Head*, 2002 WI 99 at ¶ 5. Peters would be entitled to an instruction on imperfect self-defense if the trial evidence placed the mitigation defense in issue. *See id.* Imperfect self-defense is placed in issue when, under a reasonable view of the trial evidence, a jury could conclude that the State has failed to meet its burden to disprove either that Peters *actually* believed she was in imminent danger of death or great bodily harm or she *actually* believed the force she used was necessary to defend herself. *Id.*

¶ 20.   Because the trial court applied the more demanding objective threshold requirement, it never addressed the question of whether Peters had formed an actual belief that she needed to act in self-defense. A jury instruction under imperfect self-defense would have permitted the jury to convict Peters of second-degree intentional homicide. Wis. Stat. § 940.01(2)(b). Without the self-defense jury instruction, the jury was left with only two options: convict Peters of first-degree intentional homicide or acquit. Thus, Peters never had the opportunity to fully and fairly try her case under the appropriate standards for imperfect

self-defense. Accordingly, we reverse the judgment and order and remand the case for a new trial.

¶ 21. Next, we apply the standards articulated in *Head* for perfect self-defense to the facts of this case. We conclude that the trial court erred by refusing to deliver a jury instruction on perfect self-defense. As the court stated in *Head*, "[a] defendant is entitled to an instruction on perfect self-defense when the trial evidence places self-defense in issue." *Head*, 2002 WI 99 at ¶ 4. In order to place perfect self-defense in issue a defendant need present only "some" evidence supporting the claim of self-defense measured against the objective reasonable threshold for perfect self-defense announced in *Head. See id.* at ¶ 125. Once the evidence places perfect self-defense in issue, the State bears the burden of disproving the defense beyond a reasonable doubt. *See id.* at ¶ 106.

¶ 22. When applying the "some" evidence standard, the trial court must determine whether a reasonable construction of the evidence will support the defendant's theory "viewed in the most favorable light it will 'reasonably admit from the standpoint of the accused.' " *Id.* at ¶ 113 (citation omitted). If the evidence supports the defendant's theory and if that evidence viewed most favorably to the defendant would allow a jury to conclude that the State did not disprove the self-defense theory beyond a reasonable doubt, the factual basis for the defense theory has been satisfied and the court should submit the jury instruction. *See id.* at ¶¶ 5, 115.

¶ 23. The standard for reasonableness is "what a person of ordinary intelligence and prudence would have believed in the position of the defendant under the

circumstances existing at the time of the alleged offense." Wis JI—Criminal 1014 (1994). The reasonableness of "that belief must be determined from the standpoint of the defendant at the time of his acts." *Id.* In applying the reasonableness standard, the court has recognized the relevance of some personal history evidence in the context of homicides in battered spouse situations. *State v. Hampton*, 207 Wis. 2d 367, 382, 558 N.W.2d 884 (Ct. App. 1996) (citing *State v. Richardson*, 189 Wis. 2d 418, 426, 525 N.W.2d 378 (Ct. App. 1994)).[3]

---

[3] Because this case may be retried, we note that it is important to make an observation concerning defense counsel's presentation of battered women's syndrome. At trial, counsel questioned two witnesses who worked in the domestic violence field, Debra Adams and Mary Beth Kelly, about the general dynamics of domestic abuse. Counsel did not ask either witness any questions or hypotheticals directly related to Peters. At the postconviction hearing, counsel testified that he understood the law to limit expert testimony to giving examples of the cycle of abuse, the type of conduct expected in an abusive relationship, and the responses of victims of abuse. This is an incomplete statement of the law regarding expert testimony and battered women's syndrome. Comparison testimony is permitted so long as it does not include *conclusions* about the battered person's actual beliefs at the time of the offense, about the reasonableness of those beliefs or about the person's state of mind before, during and after the criminal act. *State v. Richardson*, 189 Wis. 2d 418, 426, 525 N.W.2d 378 (Ct. App. 1994). Thus, counsel could have elicited testimony from Kelly and Adams comparing Peters' situation to the profile of a battered woman. Further, Jennifer Parker, a domestic violence expert retained for the purposes of the postconviction hearing, stated that she could have testified about the lasting impact of verbal and psychological abuse on victims generally and how Peters compared to the profile of the verbally and psychologically battered woman she had constructed. Comparison testimony from Kelly, Adams and Parker could have provided a context both from which the judge

¶ 24.   Applying these standards to the facts, we conclude that, viewing the evidence in the light most favorable to Peters, a jury could conclude the State had not disproved the perfect self-defense theory beyond a reasonable doubt and that Peters reasonably believed she was preventing or terminating an unlawful interference with her person and reasonably believed the force she used was necessary to prevent imminent death or great bodily harm.

¶ 25.   According to Peters, Marvin was psychologically and verbally abusive and she was afraid of him. Marvin kept guns in the house and, as Peters stated, he had been playing with the guns in the week before the shooting. The day before the shooting, Marvin looked down the scope of a gun at Peters and she was frightened he was going to shoot her. On that same day, when the couple had discussed divorce, Marvin told Peters that someone would die before there would be a divorce. The morning of the shooting the couple was arguing and Marvin picked up the phone to call a lawyer (as the State notes in its brief, presumably to discuss divorce). When Peters asked to call her son to have him come and pick her up that morning, Marvin pulled the phone cords out of the wall and told her she was not going anywhere.

¶ 26.   Further, Peters testified that just before she shot Marvin she had thought that he had dropped his hand and was reaching for a gun that he usually kept

could have made an informed determination about whether to issue a self-defense jury instruction and from which the jury could understand, and in the case of perfect self-defense assess the reasonableness of, Peters' beliefs that she was in imminent danger of death or great bodily harm and that the force used was necessary to defend herself. *See id.* at 427.

162

near where he was sitting at the time. Nord and Zimmerman both testified that Marvin normally placed a gun near the chair he was sitting in when Peters shot him. Nord stated that he thought that it would not be difficult for Marvin to reach the gun from where he sat. Finally, when he arrived at the scene, Marvin's son, Stephen, stated to the 911 dispatcher, who confirmed that Stephen made the statement, that a rifle was located in the area of Marvin's body.

¶ 27. In support of its argument that the trial court properly rejected the perfect self-defense jury instructions, the State observes that the trial court took note of several credibility problems with Peters' version of the events in rendering its decision. The trial court recognized that the police found the rifle in the corner of the dining room behind a bookcase and covered in cobwebs, which contradicts the statements Stephen made to the 911 dispatcher, and noted that Peters did not tell police about seeing Marvin move his hand toward where he usually kept the rifle until six months after the shooting. Finally, in reaching its conclusion, the trial court, like the court of appeals in *Head*, placed great weight on the fact that Peters did not testify that Marvin had made any direct verbal threats against her or that he had engaged in any overtly violent acts or gestures at the time she shot him. These issues involve the weight and credibility of the evidence and the reasonableness of Peters' beliefs and, as such, are more properly addressed to a jury.[4]

---

[4] The "some" evidence standard is a relatively low threshold, in part because of the distinct functions of judge and jury. Walter Dickey, David Schultz & James Fullin, Jr., *The Importance of Clarity in the Law of Homicide: The Wisconsin Revision*, 1989 Wis. L. Rev. 1323, 1347. First, evaluating the weight and credibility of evidence is traditionally within the

¶ 28. The question before us, as it was by law before the trial court, is not what the "totality of the evidence" reveals but rather, whether a reasonable construction of the evidence viewed in the light most favorable to the defendant will support the defendant's theory. *See State v. Mendoza*, 80 Wis. 2d 122, 153, 258 N.W.2d 260 (1977). If the question is answered affirmatively, then it is for the jury, not for the trial court or this court, to determine whether to believe the defendant's version of the events. *Id.* Peters has met her burden under the "some" evidence standard and it is for the jury to decide whether to believe her version of the events.

¶ 29. Since we have determined that the trial court committed error, we must therefore assess whether the substantial rights of Peters have been affected. An error does not affect the substantial rights of a defendant if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error. *State v. Harvey*, 2002 WI 93, ¶ 49, No. 00–0541–CR. If the jury had been properly instructed, it could have concluded that Peters did have a reasonable belief that she needed to act in self-defense and, therefore, may not have returned a guilty verdict. Thus, the error the trial court committed is not harmless and we reverse and remand the case to the trial court for a new trial.[5]

---

province of the jury. *Id.* Second, perfect self-defense has a significant objective component requiring the evaluation of the reasonableness of the defendant's belief or actions. *See id.* Such evaluations require the application of a community standard that also traditionally has been entrusted to the jury. *Id.*

[5] We appreciate that the facts in this case very much resemble those in *Head* and the law is directly from *Head*. But

*By the Court.*—Judgment and order reversed and cause remanded with directions.

in *Head*, the supreme court was not convinced that the perfect self-defense instruction would have been given even had the trial court had the benefit of *Head*. For this reason, the court left it up to the trial court at the possible retrial to consider whether the perfect self-defense instruction should be given. *State v. Head*, 2002 WI 99, ¶ 4, No. 99–3071–CR. Here, we conclude that remand with directions similar to those given in *Head* would be inappropriate. In the first trial, there was "some" evidence from which the jury could find that a reasonable person in Peters' position would have felt that her life was in danger and that acting in self-defense was necessary. Therefore, if there is a new trial and the evidence produced by Peters is substantially similar to that produced in the first trial, the trial court must give the perfect self-defense instruction. By so holding, it is evident that we do not read *Head* to mandate a remand with the same directions as those announced in *Head* in every case.