**2025 WI 34**

# Supreme Court of Wisconsin



STATE OF WISCONSIN,
*Plaintiff-Respondent,*

*v.*

JOAN L. STETZER,
*Defendant-Appellant-Petitioner.*

No. 2023AP874-CR
Decided July 3, 2025

REVIEW of a decision of the Court of Appeals
Waukesha County Circuit Court (Paul Bugenhagen Jr., J.) No.
2017CM1014

DALLET, J., delivered the majority opinion of the Court, in which
ANN WALSH BRADLEY, REBECCA GRASSL BRADLEY, HAGEDORN, and
PROTASIEWICZ, JJ., joined, and in which ZIEGLER, J., joined except for ¶¶4,
24–29, and 39. ZIEGLER, J., filed a concurring opinion. KAROFSKY, C.J., filed
a dissenting opinion.

¶1    REBECCA FRANK DALLET, J.    Joan Stetzer was physically,
emotionally and sexually abused by her husband for many years. During
one particularly violent attack, Stetzer fled in her vehicle despite having
consumed alcohol. She headed for safety at the couple's lake house 15
minutes away. Before she reached the lake house, however, Stetzer was
stopped by police and arrested. She was ultimately charged with

operating a motor vehicle with a prohibited alcohol concentration (PAC) as a second offense in violation of WIS. STAT. § 346.63(1)(b) (2017–18).[1]

¶2 At trial, Stetzer stipulated that her blood alcohol concentration was above the legal limit, but argued that she was acting under circumstances of coercion, a complete defense under WIS. STAT. §§ 939.45(1) and 939.46(1). That defense would allow Stetzer to operate a motor vehicle with a PAC if a threat by another person caused her reasonably to believe that doing so was the only means of preventing imminent death or great bodily harm. Stetzer argued that her husband's violent attack was indeed such a threat, and that she reasonably believed that driving to the lake house was the only means of preventing imminent death or great bodily harm.

¶3 After a bench trial, the circuit court concluded that the elements of the coercion defense were met when Stetzer initially decided to drive away from her home, agreeing with Stetzer that "definitely she had to get out of there" and that "there was a fear of great bodily harm or death." But the circuit court nevertheless held that the State proved beyond a reasonable doubt that, by the time she was pulled over, Stetzer was no longer acting lawfully under the coercion defense based on a "timing issue." Surmising that "there has to be an end point to the defense," the circuit court found that, at some point before she was pulled over, Stetzer knew there were means of safety available other than continuing to drive. For this reason, the circuit court concluded that the elements of the defense were no longer met, and thus found Stetzer guilty of operating a motor vehicle with a PAC.

¶4 This case presents two legal questions regarding the coercion defense. First, when a defendant commits an ongoing, otherwise-criminal act, like operating a motor vehicle with a PAC, must the elements of the coercion defense be met for the entire duration of that act? Second, can a defendant's personal history be relevant to the reasonableness of her belief that committing a crime was the only means of preventing imminent death or great bodily harm? We answer "yes" to both questions. We further determine that the circuit court applied the correct legal

---

[1] All subsequent references to the Wisconsin Statutes are to the 2017–18 version unless otherwise specified.

standards and that its decision is supported by sufficient evidence. We therefore affirm the court of appeals' decision holding the same.

I

¶5    Stetzer and her husband, Bill Behlmer, married in 1989. According to Stetzer, the couple initially got along well. This began to change, however, around the birth of the couple's third child. Behlmer grew distant, irritable, and over-reactive. Over time, his behavior escalated, first to verbal abuse and then to physical abuse. In 2015, Stetzer learned that Behlmer had been having multiple affairs. When Stetzer first confronted him about these affairs, he became physically violent, swinging at her with a closed fist, shoving her into their fireplace, and throwing her down on the ground. In the following years, the abuse continued, with Behlmer admitting that he physically abused Stetzer at least 15 times and that he verbally abused her hundreds of times throughout their marriage. Stetzer also testified that she endured sexual abuse and that he twice infected her with sexually transmitted infections. To get away from Behlmer's abuse, Stetzer would at times temporarily move to the couple's lake house, located about 15 minutes away from their primary home. Stetzer viewed the lake house as a safe place because it has interior chain locks on the doors that prevent someone from entering even if they have a key.

¶6    On the night of May 23, 2017, Stetzer and Behlmer began arguing about his affairs. Stetzer testified that Behlmer "went irate," used profanity, and pushed and grabbed her several times. Behlmer eventually left the house. While he was gone, Stetzer gathered his clothes and placed them outside on the patio in the rain. She texted him that he should come get his clothes and move out, and then went to bed.

¶7    Stetzer was awakened around 1:00 a.m. by a door slamming and Behlmer yelling at her to "get the fuck out of bed" and get his clothes. Behlmer became violent, pushing and shoving her. He screamed at Stetzer to pick up his clothes or he would "take [her] out." He also threatened that she was "going to pay for this" and that he was going to "kick [her] fucking ass." Behlmer then pushed Stetzer down the stairs, causing her pain in her shoulder, chest, neck, and hip.[2]

---

[2] Stetzer is an anesthesiologist and testified that she did not seek medical attention because she might encounter a colleague, which would embarrass her.

¶8 Behlmer threatened to call the police, and taunted Stetzer that the police would arrest her instead of him, which had happened in the past. He accidentally dialed 911 but quickly hung up. Around the same time, Stetzer went outside. When the police called back, Behlmer told them that she was likely driving to the lake house and that she may be intoxicated. When Stetzer reentered the house, he ran at her with a closed fist, telling her to "get the hell out." Stetzer testified that Behlmer had a look on his face that she had never seen before. He then ran after Stetzer into the garage carrying a large metal pot,[3] "whipped" the pot at her, and continued to chase her outside and around her car. Stetzer managed to get inside her car and lock the doors. Behlmer pounded on the windows of the car and yelled "I'm going to take you out you fucking bitch." Stetzer testified that she was frightened that he would break the windows of the car.

¶9 Despite drinking a number of glasses of wine earlier that evening, Stetzer fled in her car, testifying that she did not believe she had another alternative. At first, Stetzer said she was "just trying to escape," without a particular destination in mind, but she soon decided to drive to the lake house. About halfway there, Stetzer passed Officer Kimberley Kuehl in a police car pulled over on the side of the road. Officer Kuehl had learned of Behlmer's report that Stetzer was likely driving to the lake house and that she may be intoxicated, and had positioned herself along Stetzer's expected route. Stetzer acknowledged at trial that she saw the police car. When asked why she did not stop, Stetzer testified, "I thought about it. I thought should I stop, and I thought no, I'm not going to stop, I have called the police on two other occasions when being physically abused. [Behlmer] lied and I got arrested."

¶10 After observing Stetzer weaving and veering in her lane, Officer Kuehl initiated a traffic stop. Stetzer admitted that she had been drinking. She told Officer Kuehl that her husband had thrown her down the stairs and that she was going to the lake house "to get out of there." Officer Kuehl testified that Stetzer appeared to be afraid of her husband and that she was crying. During the stop, Stetzer exhibited signs of impairment, and a subsequent blood draw showed that her blood alcohol

---

[3] Stetzer testified that the pot was 10 to 12 inches in diameter, "heavy duty" with a "weighted bottom," and weighed three to five pounds.

concentration was over the legal limit of 0.08. She was arrested and charged with operating a motor vehicle with a PAC as second offense.[4]

¶11 Stetzer requested a bench trial. At trial, she stipulated that her blood alcohol concentration was above the legal limit for driving, but nevertheless argued that the coercion defense, defined in §§ 939.45(1) and 939.46(1), provided a complete defense to operating a motor vehicle with a PAC. That defense applies when "[a] threat by a person . . . causes the actor reasonably to believe that his or her act is the only means of preventing imminent death or great body harm to the actor . . . and which causes him or her so to act . . . ." § 939.46(1). The State conceded at trial that Stetzer produced sufficient evidence to argue coercion.[5] The burden was thus on the State to prove beyond a reasonable doubt that Stetzer did not act lawfully under that defense.[6]

¶12 In addition to testimony from Stetzer and Behlmer about the history of abuse in their marriage and the events leading up to Stetzer's arrest, the defense offered expert testimony on domestic violence. Dr. Darald Hanusa, a psychotherapist and clinical social worker specializing in domestic violence, testified that on the night in question, Stetzer was presented with a "classic dilemma" for a person experiencing domestic violence: "[d]oes she stay with the possibility of being injured or does she

---

[4] Stetzer was also charged with operating a motor vehicle while intoxicated (OWI) as a second offense under WIS. STAT. § 346.63(1)(a) and disorderly conduct with a domestic abuse modifier under WIS. STAT. §§ 947.01(1) and 968.075(1)(a). Before trial, the disorderly conduct charged was dismissed on the State's motion. Stetzer was tried and found guilty of both OWI and operating a motor vehicle with a PAC. After trial but before entry of judgment and sentencing, however, the OWI charge was also dismissed. *See* WIS. STAT. § 346.63(1)(c). Because Stetzer's appeal concerns only her conviction for operating a motor vehicle with a PAC, we will not discuss the OWI or disorderly conduct charges further.

[5] *See State v. Keeran*, 2004 WI App 4, ¶6, 268 Wis. 2d 761, 674 N.W.2d 570 (citing *State v. Stoehr*, 134 Wis. 2d 66, 87, 396 N.W.2d 177 (1986)) (explaining that a defendant asserting the coercion defense has the initial burden of producing some evidence to support the defense).

[6] *See Moes v. State*, 91 Wis. 2d 756, 766, 284 N.W.2d 66 (1976).

take a risk to drive a car to flee to safety?" Dr. Hanusa also explained that fear is a primary factor in the decisions of domestic violence victims and that victims often do not call the police.[7] He further opined that because Stetzer had an "adverse relationship with the police department," the police would be "the last people she's going to call for help."

¶13     The circuit court ultimately concluded that the State had disproved the coercion defense beyond a reasonable doubt "because of the timing issue." The circuit court credited Stetzer's testimony, and found that when Stetzer initially decided to drive, "definitely she had to get out of there, that there was a fear of great bodily harm or death . . . ." Once Stetzer left the driveway, however, the circuit court noted that "she didn't drive to a police station, she didn't drive to a public area . . . ." The circuit court stated that "this is where I consider what would a reasonable person of ordinary intelligence and prudence do." According to the circuit court, even accepting "all the circumstances that were going on at that point" and "putting ourselves in [Stetzer's] position," "once she's out of the driveway she has more options. The driving to the lake home is not the only means of preventing harm." The circuit court continued, "She passed a police officer. She's in a city she knows. So beyond a reasonable doubt she knows there's other means of safety around other than going to the lake house . . . ."

¶14     The circuit court emphasized that "there has to be an endpoint to the defense" and that "[p]ublic policy wouldn't support that that person could keep on driving indefinitely, that you could get in the car and say well I have to drive to—from Wisconsin to Tennessee because I need to be so far away from that situation." The circuit court thus concluded, "So her actions were reasonable. I don't discount that. The law however provides that it has to be the only means of preventing great bodily harm or imminent death. I can't find that so that is the decision." Accordingly, the circuit court found Stetzer guilty of operating a motor vehicle with a PAC.

¶15     In an unpublished opinion, the court of appeals affirmed the circuit court's judgment. *State v. Stetzer*, No. 2023AP874-CR, unpublished

---

[7] Dr. Hanusa also testified that reasons why victims do not call the police may include that they do not want the abuser to be arrested or that they feel embarrassment or shame.

slip op., ¶25 (Wis. Ct. App. Mar. 27, 2024). It emphasized the circuit court's factual finding that, at least when Stetzer passed the police car, she knew there were means of safety available other than going to the lake house. *Id.*, ¶19. The court of appeals reasoned that even "[a]ccepting (as the trial court did) that driving was the correct answer to the 'classic dilemma' that Stetzer's expert said she faced," "evidence in the [r]ecord does not show that Stetzer *continued* to hold a reasonable belief that, once she was out of her husband's immediate vicinity," driving was the only means of preventing imminent death or great bodily harm. *Id.*, ¶23 (emphasis in original).

## II

¶16 Whether the circuit court applied the correct legal standard, and any related issues of statutory interpretation, are questions of law which we review *de novo. State v. Magett*, 2014 WI 67, ¶27, 355 Wis. 2d 617, 850 N.W.2d 42; *Clean Wis., Inc. v. DNR*, 2021 WI 72, ¶10, 398 Wis. 2d 433, 961 N.W.2d 611. When reviewing whether there is sufficient evidence to support a criminal conviction, we are highly deferential to the factfinder's verdict. *State v. Beamon*, 2013 WI 47, ¶21, 347 Wis. 2d 559, 830 N.W.2d 681. We will not reverse a conviction by the circuit court unless "the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force" that no reasonable factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Poellinger*, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990); *see also Gauthier v. State*, 28 Wis. 2d 412, 416, 137 N.W.2d 101 (1965) (clarifying that the standard of review is the same for criminal verdicts rendered in jury and bench trials).

## III

¶17 We begin our analysis by addressing, in turn, the two legal issues presented in this case regarding the coercion defense defined in §§ 939.45(1) and 939.46(1). We then evaluate the circuit court's decision in light of our holdings, and conclude that the circuit court applied the correct legal standards and that its judgment is supported by sufficient evidence.

## A

¶18 The first issue before us is whether the elements of the coercion defense must continue to be met for the entire duration of an ongoing, otherwise-criminal act. Stetzer argues that so long as the

elements of the defense were met at the beginning—here, when she first began to operate her vehicle with a PAC—then she may continue engaging in the otherwise-criminal act, even if the elements of the defense cease to be met. The State disagrees, and contends that the elements of the defense must continuously be met throughout the entire duration of an ongoing, otherwise-criminal act. We agree with the State.

¶19    We start with the text of §§ 939.45(1) and 939.46(1), the statutes defining the coercion defense. Section 939.45 lists several defenses to criminal prosecution, including one that applies "[w]hen the actor's conduct occurs under circumstances of coercion . . . ." § 939.45(1). Section 939.46(1) identifies when an individual's conduct occurs under circumstances of coercion, providing, in relevant part, that "[a] threat by a person . . . which causes the actor reasonably to believe that his or her act is the only means of preventing imminent death or great bodily harm to the actor . . . and which causes him or her so to act is a defense to a prosecution for any crime based on that act . . . ." The "circumstances of coercion" referenced in § 939.45(1) are therefore present only when the three elements in § 939.46(1) are met: (1) there is a threat by another person;[8] (2) the threat causes the defendant reasonably to believe that an otherwise-criminal act is the only means of preventing imminent death or great bodily harm; and (3) the threat causes the defendant to engage in the act.

¶20    The most natural reading of this statutory language is that the coercion defense is available only when all three elements laid out in § 939.46(1) are met. Section 939.45(1) makes clear that the coercion defense is available only when an individual's "conduct occurs under circumstances of coercion." And those circumstances are present only when all three elements of § 939.46(1) are met. Thus, although the coercion defense may be available at the beginning of an ongoing act, it may become unavailable if circumstances change so that the act is no longer "occur[ing] under circumstances of coercion."

¶21    Requiring the elements of the coercion defense to be met throughout the duration of an ongoing act is consistent with how we have interpreted the closely related defenses of self-defense and defense of others. *See e.g., Clean Wis.*, 398 Wis. 2d 433, ¶10 (explaining that we read

---

[8] The person must not be a coconspirator of the defendant. *See* § 939.46(1).

statutes in context and consistently with closely related provisions). Like coercion, these other defenses permit an individual to engage in otherwise-criminal conduct (use of force against another) under certain narrow circumstances without facing liability—namely, when the individual reasonably believes that the force is necessary to prevent unlawful interference with the individual's person or with a third person. *See* WIS. STAT. § 939.48(1), (4); *see also State v. Amundson*, 69 Wis. 2d 554, 568, 230 N.W.2d 775 (1975) (observing that "[c]oercion is highly analogous to the privilege of self-defense" because both "look to the reasonableness of the actor's belief that his only safe recourse is the commission of a criminal act"), *overruled on other grounds by State v. Wayerski*, 2019 WI 11, 385 Wis. 2d 344, 922 N.W.2d 468. Significantly, we have concluded that these related defenses are available only when a defendant or a third person is actually under threat. *See, e.g., State v. Jones,* 147 Wis. 2d 806, 815, 434 N.W.2d 380 (1989) ("The key question is whether, when [the victim] was stabbed, the defendant reasonably believed that his sister faced imminent death or great bodily harm or whether . . . the threat . . . had passed by the time of the stabbing."). Even more to the point, we have held that when the otherwise-criminal act is ongoing, like possessing a firearm as a felon or carrying a concealed weapon, a defendant arguing self-defense must not have continued the act any longer than reasonably necessary. *See State v. Coleman*, 206 Wis. 2d 199, 211, 556 N.W.2d 701 (1996) (felon in possession of a firearm); *State v. Nollie*, 2002 WI 4, ¶26, 249 Wis. 2d 538, 638 N.W.2d 280 (carrying a concealed weapon).

¶22 Our interpretation of the coercion defense also finds support in how other jurisdictions have interpreted similar defenses. The Supreme Court of Alaska, for example, held that defendants asserting the necessity defense for continuing offenses, like drunk driving, must show some evidence that they stopped violating the law as soon as the necessity ended. *Greenwood v. State*, 237 P.3d 1018, 1022 (Alaska 2010). And New Jersey courts have noted that in a drunk-driving prosecution, "the distance a driver traveled might be relevant to the defense of necessity if the driver had escaped the harm and continued to drive." *See State v. Romano*, 809 A.2d 158, 160 n.1 (N.J. Super. Ct. App. Div. 2002). Other courts have come to the same conclusion outside the specific context of drunk driving. *See, e.g., United States v. Sawyer*, 558 F.3d 705, 711 (7th Cir. 2009) ("[W]hen a defendant presenting a duress defense committed an ongoing crime . . . that defendant must have ceased committing the crime

as soon as the claimed duress lost its coercive force.").[9] And still others have held that coercion or similar defenses apply only as long as the elements of the defense continue to be met. *See, e.g., United States v. Butler*, 485 F.3d 569, 572 (10th Cir. 2007) (explaining that the defense of justification "is available only so long as all of [its elements] continue to exist").[10]

¶23    Stetzer's interpretation, by contrast, lacks a meaningful limiting principle and would dramatically expand the scope of the defense. Accepting Stetzer's argument that the elements of the coercion defense need to be met only at the beginning of an ongoing, otherwise-criminal act would mean that an individual who is coerced in the first instance is free to ignore clearly safe alternatives to continued criminal conduct, or may continue engaging in such conduct even long after the threat has dissipated.[11] In other words, the coercion defense could apply

_____

[9] *See also Butler v. State*, 14 So. 3d 269, 271 (Fla. Dist. Ct. App. 2009) (stating the elements of the necessity defense, including that "the defendant ceased the criminal conduct as soon as the necessity or apparent necessity for it ended"); *Commonwealth v. Melzer*, 437 N.E.2d 549, 555–56 (Mass. App. Ct. 1982) (concluding that a defendant's failure to abandon an ongoing criminal act when he had a chance to do so prevented him from later asserting a coercion defense).

[10] *See also McMillan v. State*, 51 A.3d 623, 638–39 (Md. 2012) (holding that duress must continue for the length of the defendant's involvement in the coerced crime); *State v. Dupree*, 373 P.3d 811, 825 (Kan. 2016) (listing the requirements of the compulsion defense, including that the compulsion must be continuous).

[11] Stetzer appears to argue that because coercion is "a complete defense," once it attaches, it continues to apply for the entire duration of an act even if its elements cease to be met. But whether a defense is "complete" or "mitigating" depends on whether it absolves the defendant of all criminal liability (complete) or merely reduces charges or penalties (mitigating). *See, e.g., State v. Kizer*, 2022 WI 58, ¶21, 403 Wis. 2d 142, 976 N.W.2d 356 (contrasting a "complete defense" with a defense that "merely mitigates" a charge to a lesser charge). Indeed, coercion itself is only a mitigating defense when it comes to first-degree intentional homicide. *See* WIS. STAT. § 939.46(1) (stating that coercion is "a defense to a prosecution for any crime based on [the coerced act], except that if the prosecution is for first-degree intentional homicide, the degree of the crime is reduced to 2nd-degree intentional homicide"). Observing that coercion is a

even if the act is no longer "occur[ing] under circumstances of coercion," as required by §§ 939.45(1) and 939.46(1). We decline to adopt this expansive interpretation and therefore hold that the elements of the coercion defense must continuously be met throughout the duration of an ongoing, otherwise-criminal act.

B

¶24    With respect to the second issue before us, Stetzer argues that the circuit court failed to consider her personal history of domestic violence and interactions with the police when determining whether she reasonably believed that operating a motor vehicle with a PAC was the only means of preventing imminent death or great bodily harm. In response, the State asserts that a defendant's personal history is always irrelevant to what she reasonably believed. We disagree with the State's categorical claim that personal-history evidence is always irrelevant to the reasonableness of a defendant's belief. As explained in Part III.C, *infra*, however, we also reject Stetzer's characterization of the circuit court's decision.

¶25    Beginning with the text, § 939.46(1) provides a defense to prosecution for an otherwise-criminal act when a threat "causes *the actor* reasonably to believe that his or her act is the only means of preventing imminent death or great bodily harm . . . ." (emphasis added). This language indicates that the inquiry is whether it was reasonable for *the defendant* to believe there was a threat of imminent death or great bodily harm and that her act was the only means of preventing that harm.

¶26    In the analogous contexts of self-defense and defense of others, we have held that when determining whether a defendant's beliefs were reasonable, we consider the incident "from the defendant's perspective." *State v. Stietz*, 2017 WI 58, ¶22, 375 Wis. 2d 572, 895 N.W.2d 796. The standard is whether "a prudent person in the position of the

---

complete defense to an offense like operating a motor vehicle with a PAC, however, does not imply that the defense continues to absolve a defendant of liability after its elements cease to be met.

defendant under the circumstances existing at the time of the incident" could believe what the defendant believed.[12] *Id.*, ¶15.

¶27　Importantly for our purposes, we have repeatedly held that "[t]he personal characteristics and histories of the parties are relevant to" the reasonableness of the defendant's belief.[13] *State v. Johnson*, 2021 WI 61, ¶24, 397 Wis. 2d 633, 961 N.W.2d 18 (internal quotation marks omitted) (quoting *Jones*, 147 Wis. 2d at 816). Regarding self-defense, for example, we held that the defendant's testimony that he was the victim of an armed robbery at his sister's residence could support a finding that he reasonably believed he was under an imminent threat when he heard kicking at the door of that same residence. *Coleman*, 206 Wis. 2d at 203–04, 214. And regarding defense of others, we similarly held that evidence that the defendant knew the victim abused his sister and could be violent could support a finding that the defendant reasonably believed his actions were necessary to protect his sister. *Jones*, 147 Wis. 2d at 809–10, 816–19.

¶28　We conclude that evidence of a defendant's personal history can be similarly relevant in the context of coercion. Like self-defense and

---

[12] The jury instructions for self-defense accordingly state that the "reasonableness of the defendant's beliefs must be determined from the standpoint of the defendant at the time of the defendant's acts" and that "the standard is what a person of ordinary intelligence and prudence would have believed in the defendant's position under the circumstances that existed at the time of the alleged offense." Wis. JI—Criminal 800 (2023); *see also* Wis. JI—Criminal 801 (2023); Wis. JI—Criminal 805 (2023).

[13] The State cites to a court of appeals decision, *State v. Hampton*, 207 Wis. 2d 367, 558 N.W.2d 884 (Ct. App. 1996), in support of its claim that personal history is always irrelevant to the reasonableness of a defendant's belief. In *Hampton*, however, the court of appeals held only that the particular personal-history evidence offered by the defendant was irrelevant to his claim of self-defense because the evidence "involved remote instances of alleged violence committed by third persons not involved in the events surrounding [the victim's] homicide." *Id*. at 383. And the court of appeals expressly acknowledged that personal-history evidence could be relevant in a self-defense case when there are past instances of violence between the victim and defendant because, in that situation, there would be a "direct connection" between the personal-history evidence and the alleged offense. *Id*.

defense of others, the coercion defense focuses on what the defendant "reasonably believes" about both the threat and the act necessary to prevent it. *See* §§ 939.46(1), 939.48(1), (4). Determining whether the defendant "reasonably . . . believe[d] that . . . her act . . . [wa]s the only means of preventing imminent death or great bodily harm," § 939.46(1), therefore, must be determined from the standpoint of the defendant, and the operative question is what a person of ordinary intelligence and prudence would have believed in the defendant's position under the circumstances that existed at that time.[14] And if personal history can be relevant to this analysis for self-defense and defense of others, it must similarly be relevant for the defense of coercion.

¶29    The State suggests that the personal history of the defendant is irrelevant because considering it would transform "reasonableness" into a subjective standard. *See Amundson*, 69 Wis. 2d at 568. (explaining that coercion requires a finding "under the objective-reasonable man test" about the reasonableness of the defendant's belief). We disagree. Whether evidence of a defendant's personal history is admitted or not, the underlying legal question remains the same: what a person of ordinary intelligence and prudence would have believed in the defendant's position under the circumstances that existed at that time. In answering that question, the defendant's past experiences, like her present ones, may be probative of what a reasonable person in the defendant's position would have believed under the circumstances. The standard remains objective, however, because a mere subjective belief on the defendant's part is insufficient to support the coercion defense. The factfinder must still determine if the defendant's belief was objectively reasonable. Accordingly, we hold that, just as in the contexts of self-defense and defense of others, the defendant's personal history can be relevant to the reasonableness of her belief that her actions were the only means of preventing imminent death of great bodily harm.

C

¶30    Having resolved the two questions before us about the nature of the coercion defense, we now review the circuit court's decision

---

[14] Indeed, just as in the related contexts of self-defense and defense of others, the statutes themselves and the jury instructions for the coercion defense already reflect these requirements. *See* Wis. JI—Criminal 790 (2005).

concluding that the State disproved coercion beyond a reasonable doubt. Stetzer argues both that the circuit court applied incorrect legal standards and that its verdict was not supported by sufficient evidence. We take each of her arguments in turn.

¶31     First, Stetzer argues that the circuit court applied the incorrect legal standard by inserting a "timing parameter" and requiring the elements of the coercion defense to be met for the entire time that she was operating a motor vehicle with a PAC, rather than only when she first began to operate her vehicle. We held in Part III.A, *supra*, that the circuit court's interpretation of the coercion defense is correct and therefore conclude that the circuit court did not err on this ground.

¶32     Second, Stetzer argues that the circuit court again applied the incorrect legal standard by requiring that operating a motor vehicle with a PAC was *in fact* the only means for Stetzer to prevent imminent death or great bodily harm, rather than requiring only that Stetzer *reasonably believed* that it was the only means of prevention. During its oral ruling, the circuit court stated that "the law doesn't ask me to determine if her actions were reasonable. The law requires that this is the only means of prevention." Similarly, the circuit court stated that "her actions were reasonable. I don't discount that. The law however provides that it has to be the only means of preventing great bodily harm or imminent death." According to Stetzer, these statements do not accurately describe the requirements of the coercion defense and therefore demonstrate that the circuit court applied the incorrect legal standard when deciding whether the defense had been disproven.

¶33     While the statements Stetzer points to are indeed imprecise, the entirety of the circuit court's decision shows that it did apply the correct legal standard.[15] The circuit court stated that it was considering what "a reasonable person of ordinary intelligence and prudence [would] do" while accepting "all the circumstances that were going on at that

---

[15] Regarding the circuit court's imprecise statements, we agree with the court of appeals that these statements are best read in context as an attempt to emphasize the distinction between an act being "one of several reasonable plans for escap[e]" and the requirement of the coercion defense—that the defendant reasonably believed the act was *the only* option. *State v. Stetzer*, No. 2023AP874-CR, unpublished slip op., ¶20 (Wis. Ct. App. Mar. 27, 2024).

point" and putting itself "in [Stetzer's] position." In addition, the circuit court's decision turned on its finding that, at least when Stetzer passed the police car, she *knew* beyond a reasonable doubt that there were "means of safety around other than going to the lake house . . . ." And it follows from this finding that Stetzer's belief that operating a motor vehicle with a PAC was the only means of preventing imminent death or great bodily harm was, at that point, no longer reasonable.[16] The circuit court's decision was thus correctly based on a determination about the reasonableness of Stetzer's belief.

¶34 Third, and finally, Stetzer argues that the circuit court's decision was not supported by sufficient evidence. Stetzer argues that she presented evidence of a terrifying course of events, decades of abuse, and how domestic violence impacts a victim's decision-making. According to Stetzer, no reasonable factfinder considering this evidence could have found that it was unreasonable for her to believe that continuing to drive to the lake house despite her PAC was the only means of preventing imminent death or great bodily harm.

¶35 We disagree. When reviewing the sufficiency of the evidence to support a conviction, we are highly deferential to the factfinder's verdict. *Beamon*, 347 Wis. 2d 559, ¶21. That is because "[i]t is the function of the trier of fact, and not of an appellate court, to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Poellinger*, 153 Wis. 2d at 506. We may not substitute our own judgment for that of the factfinder, therefore, "unless the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force" that no reasonable factfinder could have found guilt beyond a reasonable doubt. *Id.* at 507.

¶36 Here, the circuit court's conclusion that coercion had been disproven centered on two key factual findings: Stetzer knew she passed a police car and Stetzer was in a city she knows well. Those findings are

---

[16] Nothing in this opinion or the circuit court's decision diminishes or dismisses the fact that Behlmer posed a threat of imminent death or great bodily harm to Stetzer. Nevertheless, the question before us is whether a reasonable factfinder could have concluded that Stetzer reasonably believed that continuing to drive with a PAC all the way to the lake house was the only means of preventing death or great bodily harm, despite having other options.

amply supported by the evidence, and indeed are not disputed. Stetzer herself acknowledged that she saw the police car and that she thought about stopping, testifying that she thought "should I stop, and I thought no, I'm not going to stop, I have called the police on two other occasions when being physically abused. [Behlmer] lied and I got arrested." On the basis of the findings that Stetzer knew she passed a police car and was in a city she knew, a reasonable factfinder could conclude, as the circuit court did, that beyond a reasonable doubt Stetzer knew there were other means of preventing imminent death or great bodily harm, and that the coercion defense was therefore disproven.

¶37 Stetzer nevertheless argues that the circuit court's verdict is not supported by sufficient evidence because she did not trust the police and feared they would arrest her, and that it was therefore reasonable for her to believe that continuing to drive past the police car was the only means of preventing imminent death or great bodily harm. But a reasonable factfinder could conclude, her distrust of police and fear of arrest notwithstanding, that Stetzer could not reasonably believe that she would still be under a threat of imminent death or great bodily harm by Behlmer while in the police's presence. Moreover, a reasonable factfinder could have relied, as the circuit court did, on Stetzer's knowledge of the area. In particular, the record indicates that on the way to the lake house, Stetzer passed a hotel that she knew was open. A reasonable factfinder considering this record could have reached the same conclusion as the circuit court: that the coercion defense had been disproven.

IV

¶38 The long-standing abuse that Stetzer endured at the hands of Behlmer and the events of May 23 and 24, 2017, are tragic. It is undisputed that Stetzer faced an imminent threat of death or great bodily harm that night, and that she reasonably believed that driving away from the house was the only means of preventing that threat. But it is only what happened after that point that is before us.

¶39 The circuit court concluded that, at some point before Stetzer was pulled over, she could no longer reasonably believe that continuing to operate a motor vehicle with a PAC was the only means of preventing imminent death or great bodily harm. In reaching that conclusion, the circuit court applied the correct legal standards. Specifically, the circuit court correctly required that all elements of the coercion defense be met for the entire duration of Stetzer's ongoing, otherwise-criminal act and

considered Stetzer's personal history when evaluating the reasonableness of her belief that continuing to operate a motor vehicle with a PAC was the only means of preventing imminent death or great bodily harm. Additionally, a reasonable factfinder could conclude, as the circuit court did, that Stetzer's belief became unreasonable before she was pulled over. Accordingly, we affirm the court of appeals' decision.

*By the Court.*—The decision of the court of appeals is affirmed.

ANNETTE KINGSLAND ZIEGLER, J., concurring.

¶40    I join part of the majority opinion, specifically ¶¶1–3, 5–23, and 30–38. I can join the majority opinion in part because the opinion does not address the propriety of the circuit court's decision to give the instruction on the coercion defense. At trial, the State did not contest that Stetzer produced sufficient evidence to argue the coercion defense.[1] Whether it was proper to provide an instruction on the coercion defense is simply not before us.

¶41    I cannot, however, join part of the majority opinion, specifically ¶¶4, 24–29, and 39, because the majority unnecessarily reaches out to address whether personal history may be relevant to determining the reasonableness of a defendant's belief that her act was the only means of preventing imminent death or great bodily harm.[2] The court does not need to address this issue to resolve this case. As the majority opinion itself concludes, there is sufficient evidence to support the circuit court's guilty verdict even if Stetzer's personal history is considered. Said otherwise, whether or not Stetzer's personal history is considered has no bearing on the outcome of this case. "'Issues that are not dispositive need not be addressed.'"[3]

---

[1] *See State v. Keeran*, 2004 WI App 4, ¶6, 268 Wis. 2d 761, 674 N.W.2d 570 ("A defendant seeking a coercion defense instruction must meet the initial burden of producing evidence to support such an instruction." (citing *State v. Stoehr*, 134 Wis. 2d 66, 87, 396 N.W.2d 177 (1986))).

[2] *See* WIS. STAT. § 939.46(1) ("A threat by a person other than the actor's coconspirator which causes the actor reasonably to believe that his or her act is the only means of preventing imminent death or great bodily harm to the actor or another and which causes him or her so to act is a defense to a prosecution for any crime based on that act, except that if the prosecution is for first-degree intentional homicide, the degree of the crime is reduced to 2nd-degree intentional homicide").

[3] *WEC v. LeMahieu*, 2025 WI 4, ¶30 n.15, 414 Wis. 2d 571, 16 N.W.3d 469 (quoting *Md. Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶48, 326 Wis. 2d 300, 786 N.W.2d 15).

¶42    Further, the majority's analysis regarding the relevance of a defendant's personal history appears to suggest that the psychological effects prior acts of abuse may have on a defendant may be relevant personal history. We have not received meaningful briefing or argument on that issue from the parties, and courts are divided on whether such evidence is relevant to determining the objective component of the coercion defense. *See* 2 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 9.7(b) n.33 (3d ed. 2018).[4] Accordingly, we should not opine, explicitly or implicitly, on that issue in this case.

¶43    For the foregoing reasons, I join some—but not all—of the majority opinion.

---

[4] *Compare, e.g., United States v. Willis*, 38 F.3d 170, 175–77 (5th Cir. 1994), *United States v. Dixon*, 901 F.3d 1170, 1181–84 (10th Cir. 2018), *and State v. B.H.*, 870 A.2d 273, 289–91 (N.J. 2005), *with United States v. Dingwall*, 6 F.4th 744, 751–54 (7th Cir. 2021).

JILL J. KAROFSKY, C.J., dissenting.

¶44    "I'm going to take you out, you fucking bitch!" Threats, violence, abuse, manipulation, and coercion were all tactics Bill Behlmer employed to exert power and control over his wife, Dr. Joan Stetzer.[1] In the early hours of May 24, 2017, Behlmer yelled the above threat as Stetzer cowered in her truck, wearing only pajamas. She was trying to escape Behlmer's rage after he engaged in several acts of domestic abuse, including throwing Stetzer down a flight of stairs. Behlmer also threatened Stetzer by calling 911 and promising, "They [the police] [a]re going to get you just like the last time."

¶45    At 2:00 a.m., Stetzer fled in her vehicle without her phone, a change of clothes, a wallet, shoes, or even a plan. Just as Behlmer predicted, she was pulled over by the police a few miles from her house. Stetzer, not Behlmer, was arrested. She was later charged with disorderly conduct as an act of domestic violence; operating a motor vehicle with a prohibited alcohol content; and operating a motor vehicle while intoxicated.

¶46    At trial Stetzer asserted the defense of coercion, *see* WIS. STAT. § 939.46(1) (2017–18),[2] which allows a person to engage in unlawful conduct if the actor reasonably believes that the conduct is the only means of protection from a threat of imminent death or great bodily harm. Once Stetzer put forth sufficient evidence to assert the defense of coercion, the burden shifted to the State to prove beyond a reasonable doubt that she was not being coerced.

¶47    To secure a conviction, the State had to prove beyond a reasonable doubt that Stetzer did not reasonably believe that continuing to drive was her only means of protection from the threat of imminent death or great bodily harm. When assessing both reasonableness and imminence, the circuit court applied the wrong legal standard and

---

[1] Dr. Stetzer is an anesthesiologist, who practices at a number of clinics in the vicinity of her residence.

[2] All subsequent references to the Wisconsin Statutes are to the 2017–18 version.

consequently erred in concluding that the State met its burden. The majority's insistence that the circuit court correctly applied WIS. STAT. § 939.46(1) does not square with a proper interpretation of the statute and a thorough review of the evidence introduced at trial.

¶48     I begin this dissent by recounting the evidence introduced at trial, including the years of abuse Stetzer suffered at the hands of Behlmer as well as the tragic events of the night in question. I also highlight the expert testimony regarding domestic violence.[3] Then I discuss the relevant legal principles, demonstrate how the circuit court incorrectly applied the law, and explain how the majority affirms that decision in error. I end with a discussion of common misperceptions regarding domestic violence.

## I.  STETZER'S TRIAL

¶49     Stetzer requested a trial to the court. At trial she stipulated that she had driven with a blood alcohol content above the legal limit. Stetzer asserted, however, that she should be found not guilty based on the defense of coercion, WIS. STAT. § 939.46(1). The State agreed that Stetzer had submitted sufficient evidence to raise coercion. The State's burden was to prove beyond a reasonable doubt that Stetzer was not being coerced. As a result, the circuit court received evidence, through the testimony of Stetzer and Behlmer, about Behlmer's years-long history of abusing Stetzer, as well as specific facts regarding the night in question. The circuit court also heard expert testimony about domestic violence.

### A.  BEHLMER'S HISTORY OF ABUSING STETZER

¶50     According to the testimony, Behlmer's abuse of Stetzer began over 15 years before this incident. About a year after their son was born in the early 2000's, Stetzer described things taking "a turn for the wors[e]." Behlmer began snapping at Stetzer for "things that didn't make sense," coming nose-to-nose with her and yelling in her face. He gave Stetzer the silent treatment, called her fat, said she was a bad mother, and tried to convince her that "things were different than the way she was

---

[3] This opinion refers to the victim as female and the perpetrator as male at times because those are the facts of this case and, at other times, because that is consistent with the research cited. I recognize, of course, that those gender assignments do not account for all acts of domestic abuse.

remembering them." Behlmer's early physical violence included pushing Stetzer, shoving her, and grabbing and pulling her arm around to get her attention.

¶51     Behlmer's physical abuse escalated in January 2015, when Behlmer swung at Stetzer with a closed fist, causing her to fall into a fireplace. Stetzer was able to stand up, but Behlmer, while yelling and screaming, shoved her again into the fireplace. Stetzer suffered an injury to her hip causing chronic hip pain she still experiences. In March 2015, Behlmer violently threw Stetzer down four times while screaming and yelling, causing her to hit her head. In July of 2015, while at a restaurant Behlmer screamed "I'm not going to F-ing talk to you." Stetzer left on foot before their food arrived. Behlmer followed her in his car, swearing at her, and blaming her for his restaurant outburst. In August of 2015, Behlmer repeatedly rammed Stetzer's head into a cupboard, scratching her face. He then slammed the front door and drove off in his car, leaving so quickly he swerved into a ditch.

¶52     The abuse continued into 2016. One day during the summer, Stetzer arrived home, and Behlmer repeatedly shoved her while screaming "get the hell out of here." Stetzer attempted to flee to her car, and Behlmer shoved her from behind, causing Stetzer to face-plant in the driveway. In the fall of 2016, Behlmer yanked Stetzer's head, causing a neck injury. Stetzer went to urgent care the next day, where she declined to answer questions about feeling safe in her home. Stetzer sought to protect herself from the humiliation of her medical colleagues learning anything about her injuries, or the domestic violence she experienced. Behlmer also twice infected Stetzer with a sexually transmitted disease.

¶53     To shield herself from Behlmer's violence and abuse, Stetzer often escaped to the family's lake house, 15 minutes away from their home. Stetzer sometimes stayed there for months at a time. She felt safe there because she could lock the doors in a manner that prevented someone from using a key to unlock them from the outside. In further attempts to protect herself, Stetzer called law enforcement twice. However, those attempts failed. Both times, the police arrested Stetzer rather than Behlmer because the police did not believe her.

B.  BEHLMER'S ABUSE AND THREATS ON MAY 24, 2017

¶54     At about 1:00 a.m. on May 24, 2017, Behlmer attacked Stetzer yet again. He began by shoving her down the basement stairs, while

screaming threats at her. At this point Stetzer consumed wine to numb her physical pain rather than seek out medical attention and face questions from her colleagues. Stetzer escaped the residence but quickly realized she did not have her phone, shoes, or a license, so she went back inside. Behlmer continued attacking Stetzer, running at her with a fist. He belittled her by calling her names, told her to leave, and chased her out to her truck. Behlmer threw a pot at Stetzer as she was fleeing. In her words:

> [Behlmer] threw this pot at me. I hit the button as I was going out the garage door so that was about halfway open. I got underneath it and I ran around the truck twice, and I don't run as fast as he does and so I just got in it because I— he was going to catch me, locked the doors, keys were above the visor, started the truck.

Behlmer was not deterred. He pounded on the windows of the truck, yelling "I'm going to take you out, you fucking bitch." Stetzer was in her pajamas, without shoes, a wallet, or her phone. She escaped with her life. As she drove away, she saw headlights behind her, and believed Behlmer was following her, as he had done before.

¶55 At some point during his attack, Behlmer taunted Stetzer, telling her he would call 911, and that "They're going to get you just like last time." Behlmer dialed 911, hung up, and the 911 operator returned his call. Behlmer told the police that Stetzer had consumed alcohol and prescription medication and was likely driving in the direction of their lake house.

¶56 Thanks to Behlmer's call, the police waited for Stetzer on the route to their lake house. Stetzer spotted the squad car but did not stop. She explained, "I thought about it. I thought should I stop, and I thought no, I'm not going to stop, I have called the police on two other occasions when being physically abused. Bill lied and I got arrested." Stetzer anticipated the police believing Behlmer rather than her. She feared being returned home to Behlmer.

¶57 The police stopped Stetzer and she tried multiple times to explain to them how Behlmer had attacked her. The officers disregarded her report. Stetzer described her perspective: "I felt like I was a victim . . . of domestic abuse and violence that night, and I felt like I was being treated as a criminal. I was dismissed. [The officers] didn't even want to hear about what happened." One officer insisted "you're lying

about the whole thing, you're just a liar." The same officer called her "narcissistic," and another officer "didn't seem to care." In the course of being questioned, Stetzer penned a one-page account of what had transpired. In her words, "I was trying to explain that, [number one], this had happened tonight and, [number two], he had gotten away with it before."

¶58    The police ignored Stetzer's account of Behlmer's violence and abuse. They conducted only the most perfunctory of investigations into Behlmer's actions. Behlmer even hired an attorney, in anticipation of legal consequences, and was surprised that the police never questioned him again. Instead the police arrested Stetzer for operating a motor vehicle while intoxicated. She was later charged with disorderly conduct as an act of domestic violence, in violation of WIS. STAT. §§ 947.01(1) and 968.075(1); operating a motor vehicle with a prohibited alcohol content, as a second offense, in violation of § 346.63(1)(b); and operating a motor vehicle while intoxicated, also as a second offense, in violation of § 346.63(1)(a). [4]

## C.  EXPERT TESTIMONY

¶59    To support her coercion defense Stetzer relied on the testimony of Dr. Darald Hanusa, an expert in domestic violence and a Ph.D., Licensed Clinical Social Worker. Hanusa had interviewed both Stetzer and Behlmer prior to trial.

¶60    Hanusa explained how Stetzer's exposure to prior abuse and trauma shaped her view of reasonableness, especially in a situation where she was fleeing for her life. He also testified that victims of domestic violence know how dangerous it can be to leave an abusive relationship. "When she leaves can be a time when she can be hurt, abused, or murdered. We know that when victims leave, they have an increased chance of lethal violence."

¶61    Hanusa further testified about the challenges medical professionals like Stetzer face when grappling with whether to disclose their abuse and seek help from others. "If you're in a community where people know you, if you have a high profile job, you're not going to go to

---

[4] The State dismissed the disorderly conduct charge prior to trial.

the emergency room if you're injured. You're not going to talk to friends or co-workers because it's too embarrassing. So, you don't talk to anybody." Hanusa also made clear that when law enforcement intervenes and an abuser is not held to account, the abuser may become emboldened, leading to an escalation of the abuse. Hanusa described this scenario as "our worst nightmare."

¶62    Finally, Hanusa described how abuse can lead victims like Stetzer to feel completely trapped:

> [W]hen someone tells you that they're going to take you out. They're going to kill you. If you believe in fact that he can and you think he's capable of it, then that's what I mean when I say that you don't believe you can escape. He'll find you and harm you in some way. If you really believe that, based on the experience you've had, then it's going to paralyze you.

## D. CIRCUIT COURT RULING

¶63    At the close of evidence, the circuit court determined that the State proved beyond a reasonable doubt that Behlmer was no longer coercing Stetzer when she was driving, because she did not reasonably believe there was an imminent threat of death or great bodily harm. The circuit court found her guilty of both the operating a vehicle while intoxicated and operating a vehicle with a prohibited alcohol content charges, and under WIS. STAT. § 346.63(1)(c), convicted Stetzer of the prohibited alcohol content offense. Stetzer appealed, and the court of appeals affirmed. Stetzer appealed again, to this court.

## II. ANALYSIS

¶64    Whether the State met its burden to disprove the defense of coercion is a question of law that this court reviews de novo. *Jones v. State*, 226 Wis. 2d 565, ¶61, 594 N.W.2d 738 (1999).

## A. LEGAL PRINCIPLES

¶65    The coercion defense allows a defendant to engage in unlawful conduct if the defendant reasonably believes that the conduct is the only means of protection from the threat of imminent death or great bodily harm. WISCONSIN STAT. § 939.46(1), specifically provides:

6

A threat by a person other than the actor's coconspirator which causes the actor reasonably to believe that his or her act is the only means of preventing imminent death or great bodily harm to the actor or another and which causes him or her so to act is a defense to a prosecution for any crime based on that act, except that if the prosecution is for first-degree intentional homicide, the degree of the crime is reduced to 2nd-degree intentional homicide.

¶66     Once a defendant puts forth sufficient evidence to assert the defense of coercion, the burden shifts to the State to prove beyond a reasonable doubt that the defendant was not acting lawfully. *Moes v. State,* 91 Wis. 2d 756, 766, 284 N.W.2d 66 (1979) ("[T]he law . . . requires the state to bear the burden of disproving beyond a reasonable doubt an asserted coercion defense."); *see also State v. Kizer*, 2022 WI 58, ¶9, 403 Wis. 2d 142, 976 N.W.2d 356. The jury instruction makes this clear: "The State must prove by evidence which satisfies you beyond a reasonable doubt that the defendant was not acting lawfully under the defense of coercion." Wis. JI—Criminal 790 (2005).

¶67     The State's burden to disprove coercion is necessarily heavy; indeed it is the most rigorous burden of proof in our justice system. *See Marquez v. Mercedes-Benz U.S., LLC*, 2012 WI 57, ¶36, 341 Wis. 2d 119, 815 N.W.2d 314. As the jury instruction provides, "'reasonable doubt' means a doubt based upon reason and common sense. It is a doubt for which a reason can be given, arising from a fair and rational consideration of the evidence or lack of evidence." Wis. JI—Criminal 140 (2024) (citation omitted). In other words, if at the end of the trial, the evidence, or lack of evidence, leaves any doubt "for which a reason can be given" about whether the defendant was coerced, the State has not met its burden. *Id.* (citation omitted).

¶68     To prove that a defendant was not acting lawfully under the defense of coercion, the State must prove beyond a reasonable doubt that the defendant was not being coerced at the time of the criminal act. Here the State had to prove beyond a reasonable doubt that Stetzer did not reasonably believe that driving was the only means of protecting herself from the threat of imminent death or great bodily harm.

¶69     The concepts of reasonableness and imminence are central to the analysis in this case. The coercion jury instruction identifies both:

7

The law allows the defendant to act under the defense of coercion only if a threat by another person (other than the defendant's co-conspirator) caused the defendant to believe that his act was the only means of preventing [imminent public disaster] *[imminent death or great bodily harm to himself (or to others)]* and which pressure caused him to act as he did. In addition, the defendant's beliefs must have been reasonable. A belief may be reasonable even though mistaken. *In determining whether the defendant's beliefs were reasonable, the standard is what a person of ordinary intelligence and prudence would have believed in the defendant's position under the circumstances that existed at the time of the alleged offense.* The reasonableness of the defendant's beliefs must be determined from the standpoint of the defendant at the time of his acts and not from the viewpoint of the jury now.

*Id*. (emphasis added). Where the defendant is a victim of domestic abuse, the reasonableness of a defendant's belief and the imminence of the threat must assessed within the context of the abuse.

### 1. REASONABLE BELIEF

¶70     I agree with the majority that evidence of a defendant's personal history is relevant to coercion. "The personal characteristics and histories of the parties are relevant" to the reasonableness of the defendant's belief. *State v. Johnson*, 2021 WI 61, ¶24, 397 Wis. 2d 633, 961 N.W.2d 18 (citation omitted). The relevance of personal history is echoed in the jury instruction, which directs the fact-finder to evaluate what someone reasonably "would have believed in the defendant's position." Wis. JI—Criminal 790 (2005).

¶71     Personal history is particularly salient when assessing the behavior of domestic abuse victims. Hanusa framed it this way: "The question for victims of domestic violence isn't how a reasonable person reacts in this situation. The question is given trauma that the victim of domestic violence has received, how would a reasonable domestic violence survivor respond. That's the important question." The violence can have widespread effects. "As with victims of terrorism or those held hostage, a battered woman's perception of her situation and reality in general is changed and substantially altered. When this occurs, *her capacity to evaluate options is diminished substantially." United States v. Dingwall*, 6 F.4th 744, 749 (7th Cir. 2021). For a reasonable victim of domestic violence,

8

"[i]n situations of stress and trauma, there tends to be a narrowing or focusing on parts of the experience that the brain is appraising as really essential to survival and coping."[5] A domestic violence victim in survival mode will experience an "ignoring or non-processing of peripheral details."[6]

### 2. IMMINENCE

¶72 "Importantly, the word 'imminent' does not mean 'immediate.'" *Kemper Ind. Ins. Co. v. Islami*, 2021 WI 53, ¶53, 397 Wis. 2d 394, 959 N.W.2d 912 (Karofsky, J., dissenting) (explaining imminence existed when Islami's ex burned down her house, even though she was out of the country when the arson occurred). Black's Law Dictionary defines "imminent" as "dangerously impending" or "threatening to occur immediately," BLACK'S LAW DICTIONARY 894 (12th ed. 2024), whereas it defines "immediate" as, "[o]ccurring without delay; instant," *id.* at 893. As the Kansas Supreme Court has explained the distinction when discussing domestic violence, immediate and imminent danger are not synonymous. "[T]he time limitations in the use of the word 'immediate' are much stricter than those with the use of the word 'imminent.'" *Kansas v. Hundley*, 693 P.2d 475, 478 (Kan. 1985).

¶73 Understanding the distinction between imminent and immediate is especially important when assessing the culpability of a domestic violence victim who engages in unlawful conduct to protect herself from the threat of imminent death or great bodily harm. "Imminent" does not mean that the threat or harm is occurring this moment. Rather, "imminent" means that the threat or harm is impending. "[T]he use of the word 'immediate' . . . obliterates the nature of the buildup of terror and fear which had been systematically created over a long period of time. 'Imminent' describes the situation more accurately." *Hundley*, 693 P.2d at 479 (discussing the related self-defense statutory language). Conflating the two standards leads courts to improperly blame domestic violence victims for failing to exercise proper judgment. *See, e.g.,*

---

[5] DEBORAH TUERKHEIMER, CREDIBLE: WHY WE DOUBT ACCUSERS AND PROTECT ABUSERS 76 (2021) (internal quotation omitted).

[6] *Id.* at 77.

*United States v. Dixon* 901 F.3d 1170, 1179–80 (10th Cir. 2018) (holding Dixon failed to show imminence when she embezzled funds to prevent her abuser from moving in with her). Said differently, "the relevant question . . . concerns the relationship as a whole," not just the most recent incident of abuse.[7]

¶74 Hanusa explained how a domestic violence abuser is able to control his victim with imminent threats of violence. "[H]e doesn't have to beat her every day for him to use intimidation to get what he wants. The psychological abuse then can serve to modify her behavior. There's always that threat that he's capable and willing to use physical violence."

## B. APPLICATION

¶75 When applying the proper reasonableness and imminence legal standards, reasonable doubt remains as to whether Behlmer stopped coercing Stetzer once she was driving. The circuit court erred in applying these standards and incorrectly concluded that the State met its burden. The majority compounds the circuit court's errors by misconstruing the circuit court's ruling as adhering to the proper legal standards.

¶76 Beginning with reasonableness, the State failed to meet its burden because the evidence clearly showed that Stetzer reasonably believed she was still being coerced when she drove past the police officer. Had the circuit court considered Stetzer's personal history throughout the entire incident, reasonable doubt—Stetzer's reasonable belief of on-going coercion—would have be have been apparent. In its ruling the court said it considered all of the circumstances and "can take everything as true up to the time that Stetzer leaves the driveway." So, the circuit court considered the evidence regarding Behlmer's abuse until Stetzer sat in her car. But once Stetzer starting driving, the circuit court disregarded her personal history entirely.

¶77 The majority condones the circuit court's errant analysis with a wink and a nod, citing the circuit court's cursory statements that

---

[7] Rachel Still, *Coercion, Control, and Criminal Law: Rethinking Accomplice Liability and Duress for Intimate Partner Violence Survivor-Defendants*, 30 PUB. INT. L. REP. 96, 120 (2024).

the circuit court put itself in Stetzer's position and that Stetzer knew that there were other means of safety besides the lake house. Majority Op. ¶33. These isolated snippets do not establish that the circuit court actually considered Stetzer's personal history at the point in time she was driving. Upon closer examination, the record plainly shows the contrary.

¶78 The circuit court ruled that Stetzer "passed a police officer. She's in a city she knows. So beyond a reasonable doubt she knows there's other means of safety around." In deeming the police officer and the familiar city to be "means of safety," or alternatives to continuing to drive under the influence, the circuit court abandoned the legal principles defining reasonableness explained above, effectively excusing the State of its burden.

¶79 The police were hardly a means of safety for a reasonable person in Stetzer's position. Behlmer himself admitted that he had manipulated the police against Stetzer in the past. And that very night he taunted her with the threat that the police would come and "get you just like last time." Stetzer testified that if she contacted the police, they might return her to Behlmer. Stetzer learned from past experiences that the police do not believe her reports of domestic abuse. Why would the police believe her now? Why would the police keep her safe this time? The circuit court failed to consider whether a reasonable person with Stetzer's past experiences would believe that contacting the police would have interrupted the imminent threat. Had it done so, it would have identified reasonable doubt.

¶80 Likewise, Stetzer's familiarity with the area did not equate to safety for a reasonable person in Stetzer's position. The court never found that Stetzer knew of another safe place nearby, other than her lake house. The court noted that there was a hotel in the area. But Stetzer testified that she did not see any open businesses at 2:00 a.m., that Behlmer had followed her in the past, and that she believed he might be following her that night. Stetzer never testified that she viewed the hotel as a safe location. How could a hotel be safe at that time and when Behlmer might be following her? The court never evaluated whether a reasonable person in Stetzer's position would believe that the hotel was safe. Had it done so, it would have found reasonable doubt.

¶81 As for the imminence requirement, the circuit court improperly conflated immediate and imminent when assessing the reasonableness of Stetzer's belief that she was in danger. The circuit court

declared that Stetzer's reasonable belief in imminent harm disappeared the moment Stetzer drove past the police car. The circuit court reasoned that the instant Stetzer could have stopped to talk to the police, the threat of Behlmer suddenly extinguished. The majority fails to identify this error, much less account for it.

¶82 There is a material difference between imminence and immediate. *See Kemper*, 397 Wis. 2d 394, ¶53. Because imminence means something that is "dangerously impending" or "threatening to occur," it follows that Behlmer did not have to be physically present alongside Stetzer, or even close by, for him to remain an imminent threat of death or great bodily harm. In other words, imminence allows for a greater gap in time and distance between a potential attack and the decision Stetzer made in that moment. *See Hundley*, 693 P.2d at 478–79. And that is partly because this attack was not an isolated incident.

¶83 Mystifyingly, the circuit court made no mention of the years-long history of abuse that informed Stetzer's decision-making that night. Nor did it account for Hanusa's testimony that a domestic violence victim, having endured years of abuse, might behave in a state of fight-or-flight, which readily explains why Stetzer would flee. Stetzer had been a victim of Behlmer's physical abuse for years, and Behlmer's abuse that night had ricocheted between verbal (calling her names and threatening her), to psychological (calling 911 to get her arrested), to physical (throwing her down stairs, throwing a heavy pot at her, and pounding on the truck windows). Given the history of abuse and the events that preceded her driving, Stetzer was understandably still terrified of Behlmer once she started driving. And her fear did not diminish upon pulling out of the driveway. She thought the headlights behind her were Behlmer chasing her down as he had done in the past. Stetzer had no reason to believe Behlmer was no longer a threat to her. Stetzer, and any reasonable person in her circumstances, would believe that fleeing from Behlmer was her only means of safety. The presence of a police car did not alleviate the threat Behlmer posed—his aggression continued to be dangerously impending. In other words, a reasonable doubt remained as to whether the State proved that the threat was no longer imminent.

¶84 To summarize, the majority misses the mark by adopting the circuit court's incorrect conclusion that the State met its burden. The State's entire case, and the circuit court's conclusion, depended on two facts: the presence of an officer and Stetzer's familiarity with the area. Yet a diligent examination of the record—*including* those two facts—reveals

that the State failed to disprove Stetzer's coercion defense. The circuit court did not apply the correct legal principles in evaluating the State's case. Undoubtedly, Behlmer's history of abuse, and his manipulation of law enforcement, coupled with his threat to use the police to "get" Stetzer, would cause a reasonable person in Stetzer's circumstances to believe that seeking help from the police could catapult Stetzer back to Behlmer's violence and abuse. And being in a familiar place would be cold comfort to anyone in Stetzer's circumstances, given that the place was just as familiar to Behlmer, and he had followed her in the past. It was reasonable for Stetzer to believe that Behlmer's escalating physical abuse remained dangerously impending. At minimum, a reasonable doubt remained as to whether the State showed that Behlmer was no longer coercing Stetzer. The majority adopts the circuit court's legal error, effectively eliminating the coercion defense for a victim it was written to protect.

## III. THE ELEPHANT IN THE COURTROOM

¶85    I pause to acknowledge some questions many reading this opinion may find themselves asking: Why does she stay? Why doesn't she disclose the abuse? Why doesn't she call the police?

¶86    *Why does she stay?* There are countless reasons a domestic violence victim does not leave her abuser, including economic uncertainty, a desire to protect her children, religious pressure, a lack of social support, housing insecurity, immigration issues, and shame. According to Hanusa, "One of the things we know that abusers are expert at is isolating the partner." She also might stay because leaving may be the most dangerous thing she could do in the short run. A Chicago study concluded that leaving an abuser was the direct precipitating factor in 45% of femicides.[8] "That abuse victims make many courageous efforts to flee the violence is too often overlooked in the process of judging them for *now* being with the batterer."[9]

---

[8] Carolyn R. Block, *Risk Factors for Death or Life-Threatening Injury for Abused Women in Chicago*, NAT'L INST. JUST. (2000), https://citeseerx.ist.psu.edu/document?repid=rep1&type=pdf&doi=9d7c2b0ea60d1152e0b84f5aeb0318dd362078e4.

[9] Sarah M. Buel, *Fifty Obstacles to Leaving, A.K.A., Why Abuse Victims Stay*, 28 COLO. LAW. 19, 19 (1999).

¶87 *Why doesn't she disclose the abuse to others?* Domestic abuse victims may hide their experiences of abuse for a multitude of reasons. Hanusa testified in detail that domestic abuse victims like Stetzer do not talk about their abuse or seek help from others due to factors such as shame and embarrassment. "You don't have to be a woman of prominence to feel embarrassed that you made the bad choice of being with a partner who is going to abuse you and then worry about what people think if you make the choice to stay, which many battered woman do." Over time, the effects of not disclosing accumulate. Hanusa continued, "[A]fter a while, you know, your resolve starts to melt . . . [T]hese guys are adored and loved by a lot of people in the community . . . . Nobody knows what goes on behind closed doors." In the end, "[s]hame and embarrassment about the abuse may prevent the victim from disclosing it or may cause her to deny that any problem exists when questioned by well-intentioned friends, family, co-workers, or professionals."[10]

¶88 *Why doesn't she call the police?* Some domestic abuse victims do not seek assistance from law enforcement because they do not trust that police intervention will result in increased safety.[11] Hanusa made clear that there is a risk to police involvement because sometimes abusers are not held to account by law enforcement. According to Hanusa, when law enforcement does not hold an abuser accountable the violence and abuse can escalate. "That's our worst nightmare." In addition, "many battered women remain in the relationship because of lack of money, social isolation, lack of self-confidence, *inadequate police response,* and a fear (often justified) of reprisals by the batterer." *People v. Humphrey*, 921 P.2d

---

[10] *Id.* at 24.

[11] There is evidence that when police officers *themselves* experience domestic violence, they may avoid reporting to the police. Those officer-victims cite reasons that include the process not being victim-centered, negative outcomes, and firsthand awareness that policies may work against them. *See* Leticia Couto et al., *Police Victims of Domestic Abuse: Barriers to Reporting Victimization*, 34 POLICING AND SOC'Y 3, 200, 209 (2024); *see also United States v. Lopez*, 913 F.3d 807, 824 (9th Cir. 2019) (explaining why a domestic abuse victim "feared the[ police] would not help her," and how a call could lead her abuser to escalate his violence, so she did not contact them).

1, 3 (1996) (emphasis added). "'It's been documented in research study after research study' . . . that when victims report to police, 'more often than not, they are not believed, they are not deemed credible, and there is no quality investigation done . . . .'"[12]

¶89 Now that we have answers to these perennial questions, perhaps we can refocus and ask instead:

*Why did Behlmer use violence and abuse to control Stetzer?*

*Why didn't the police hold Behlmer accountable for his acts of domestic violence against Stetzer?*

Focusing on the abuser rather than the victim may have saved Stetzer from having to flee in her truck, at 2:00 AM, all alone, in bare feet, praying for protection. "[W]omen face a legal twilight zone: laws meant to protect them and deter further abuse often fail to achieve their purpose, because women . . . are simply not believed."[13]

¶90 We must do better. All victims should be treated with fairness, dignity, and respect. They should be protected and feel safe. Indeed our society should be judged by how we treat our most vulnerable. I respectfully dissent.

---

[12] TUERKHEIMER, *supra* note 5, at 83.

[13] Deborah Epstein & Lisa Goodman, *Discounting Women: Doubting Domestic Violence Survivors' Credibility and Dismissing their Experiences*, 167 U. PA. L. REV. 399 (2019).